UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2747
_____


DEAN BORST, ET AL.,

                              Plaintiffs-Appellees
                              Cross-Appellants,

                versus

CHEVRON CORP., ET AL.,

                              Defendants-Appellants
                              Cross-Appellees.

_____

Appeals from the United States District Court for the
              Southern District of Texas
_____

( October 21, 1994 )

Before POLITZ, Chief Judge, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

    This class action, brought under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* (ERISA), arose out of the merger of Gulf Oil Corporation (Gulf) and Chevron Corporation (Chevron) in 1984 and the subsequent merger of the pension plans of the two companies in 1986.  Plaintiffs, approximately 40,000 former participants of the Pension Plan of Gulf Oil Corporation (Gulf Plan), brought this action complaining of various matters occurring in connection with the merger of the two companies and their respective pension plans.  Defendants

include Chevron, Gulf, the Gulf Plan, the Chevron Corporation Retirement Plan (Chevron Plan), and the Benefits and Pension Committees of the Gulf Plan, including the members of both committees.

Both parties appeal portions of the district court's decision, *In re Gulf Pension Litigation*, 764 F.Supp. 1149 (S.D. Tex. 1991). Since oral argument before this court, the parties have settled those portions of the district court's rulings which were the subject of Chevron's appeal. Our primary concern is whether the plaintiffs are entitled to the surplus assets in the Gulf Plan upon a partial or full termination of the Plan.[1] We conclude they are not.

## Factual Background

We begin with a brief excursion into the history of the Gulf Plan, and the effect on it of Gulf's merger with Chevron. In 1944, Gulf established the Annuities and Benefits Plan of Gulf Oil Corporation (the A&B Plan). The A&B Plan was a defined benefit plan, funded entirely with contributions made by Gulf.[2] Gulf later

---

[1] Surplus assets, or "residual assets" as termed in ERISA, are "assets in *excess* of those necessary to satisfy defined benefit obligations . . . ." *Wilson v. Bluefield Supply Co.*, 819 F.2d 457, 464 (4th Cir. 1987). The parties concede that both the Gulf and Chevron Plans are each, at this time, substantially overfunded.

[2] The district court explained the difference between defined benefit plans and defined contribution plans:

"Unlike a *defined contribution* plan, under which the benefits an employee receives are contingent upon the funds contributed and the investment return on plan assets, in a *defined benefit* plan the plan itself defines the benefits to be paid. If the employer's contribution and investment return are inadequate to

2

established two additional pension plans, each a defined contribution plan:  the Supplemental Annuity Plan of Mene Grande Oil Company (SAP), established in 1957, and the Contributory Retirement Plan (CRP), established in 1963 (a continuation of the Employees' Savings Plan of Gulf Oil Corporation which had been established in 1950).[3]  These latter two plans—the SAP and CRP—were funded with contributions by Gulf as well as with contributions by eligible employees.  All three plans were designed to satisfy the qualification requirements of the Internal Revenue Code.  26 U.S.C. § 401(a).

In 1975, Gulf created the Gulf Plan by amending the three former plans to provide for central administration of the plans.[4] Although the Gulf Plan was governed by a single trust agreement beginning in 1979, the trust funds for each plan remained separate, and the benefits under each continued to be calculated independently.  The Gulf Plan continued under this arrangement until July 1986, when it was amended to become part of the Chevron Plan, an employer funded defined benefit plan.

In January 1984, Gulf learned that a group led by T. Boone

---

fund those benefits, normally the employer must make additional contributions to the plan." *In re Gulf Pension Litigation*, 764 F.Supp. at 1161-1162 n. 1.

In determining its taxable income for federal income tax purposes, an employer generally may deduct its contributions to a pension plan meeting federal qualifications.

[3]   Mene Grande Oil Company was a Venezuelan subsidiary of Gulf.

[4]   The 1975 amendments were also designed to ensure that the Gulf Plan met the qualification requirements imposed by ERISA, enacted in 1974.

Pickens planned a hostile takeover of the company. Gulf sought protection from the takeover attempt by soliciting a friendly merger with Chevron. The two companies signed a merger agreement in March 1984. During a subsequent two-year interim period the two companies operated independently under a standstill agreement while the Federal Trade Commission and Chevron-Gulf integration teams determined how to complete the merger.

On July 1, 1986, the assets of the Gulf Plan were commingled with those of the 1933 Chevron Corporation Annuity Plan to create the Chevron Plan. At the same time, defendants amended the Gulf Plan to become a supplement to the Chevron Plan. As a result of this amendment, the Gulf Plan became subject to section 18.d of the Chevron Plan, which expressly provided for the reversion of surplus assets to Chevron upon termination of the merged Plan.

In early 1986, participants in the Gulf Plan who had been terminated due to the merger with Chevron, sought confirmation from Chevron that a partial termination of the Plan had occurred, entitling them to benefits under the Plan. These former Gulf employees asked Chevron to allocate and distribute to them their share of the Plan funds, including surplus assets, as though there had been a full termination. Chevron refused both requests.

### Proceedings Below

Plaintiffs, Dean Borst, *et al.*, brought the present action in November 1986 in the United States District Court for the Southern District of Texas. Shortly thereafter, in April 1987, plaintiffs Harry Back, *et al.*, filed a similar suit in the United States District Court for the Western District of Pennsylvania. On the

4

defendants' motion, the *Back* lawsuit was transferred to Texas and consolidated with the *Borst* action. On February 26, 1990, the district court certified the consolidated suit as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2).

In their lawsuit, plaintiffs sought reimbursement to the Gulf Plan for claimed losses to the Plan as a result of alleged violations of fiduciary duties by Gulf and Chevron.[5] They also alleged that Chevron, during merger negotiations, misrepresented that it would, upon merger of the pension plans, set aside portions of the Gulf Plan assets to establish a reserve for then-existing retiree pensions. Furthermore, they asserted that a partial termination of the Gulf Plan had occurred, entitling them to their share of Plan funds as well as to a *pro rata* share of the surplus assets of the Gulf Plan.

Following a bench trial, the district court determined that Gulf and Chevron had breached certain fiduciary duties owed to plaintiffs and ordered reimbursement to the Gulf Plan accordingly. The court also agreed with the plaintiffs that a partial termination of the Gulf Plan had occurred as a result of the merger with Chevron. It found that those plaintiffs who were participants in the CRP and SAP, the defined contribution portions of the Gulf

---

[5] The alleged breaches of fiduciary duty concerned (i) the effect, of assets transferred by the Gulf Plan to a pension plan to be established by Cumberland Farms for certain former employees of Gulf, on payments to be made to Chevron for the sale of certain Gulf assets to Cumberland Farms, and (ii) the payment of Gulf Plan management fees out of the assets of the Gulf Plan rather than by Gulf. The parties have settled their claims arising from these issues, removing them from our consideration on this appeal.

5

Plan, were entitled to the surplus assets of those plans.[6] On the issue of entitlement to the surplus assets of the A&B portion of the Gulf Plan, however, the court ruled that the plaintiffs were not entitled to surplus assets because the Plan provided for reversion of surplus assets to the employer.

Chevron appealed, and plaintiffs cross-appealed. Of the variety of issues raised before the district court, most were settled during and after trial or during the pendency of this appeal. We consider here, *inter alia*, whether the plaintiffs are entitled to a *pro rata* share of the surplus assets of the A&B Plan.[7]

**Discussion**

I.  Partial Termination of Gulf Plan

Plaintiffs contend that a partial termination of the Gulf Plan occurred during the interim period between March 1984, when Gulf and Chevron signed the corporate merger agreement, and July 1986, when the two pension plans were finally merged. Accordingly, they argue, this partial termination entitled them to a *pro rata* share

---

[6]    The district court provided for immediate distribution of the surplus assets of the CRP and SAP based on its determination that those plans were wasting trusts, as membership in them had been closed, and no employee contributions had been made, since December 31, 1970, and they were so substantially overfunded that current earnings on their assets would alone be sufficient to pay all benefits and still add to the surplus. The parties have settled their claims concerning the CRP and SAP; we confine our discussion of these plans to comparison with the A&B Plan.

[7]    For purposes of our discussion, references to the A&B Plan also denote the A&B portion of the Gulf Plan as it existed in 1986 at the time of the merger into the Chevron Plan.

of the surplus assets in that Plan.[8]

The district court agreed with the plaintiffs that a partial termination had occurred.  It concluded that both vertical and horizontal partial terminations of the Gulf Plan occurred during the interim period between March 1984 and July 1986.[9]  The court

[8]    In situations where a plan provides for reversion of surplus assets to the employer, the Internal Revenue Code allows such reversion only upon a complete plan termination.  26 U.S.C. § 401(a)(2) (only after satisfaction of *all* liabilities).  *See also* 26 C.F.R. § 1.401-2(b)(1) ("The intent and purpose in section 401(a)(2) . . . is to permit the employer to reserve the right to recover at the termination of the trust, *and only at such termination*, any balance remaining in the trust which is due to erroneous actuarial computations . . . .") (emphasis added).
    Section 411(d)(3) of the Internal Revenue Code requires that a plan, in order to be qualified, provide that "upon its termination or partial termination . . . the rights of all affected employees to benefits accrued to the date of such termination, [or] partial termination . . . to the extent funded as of such date . . . are nonforfeitable."  26 U.S.C. § 411(d)(3).

[9]    The determination of whether a partial termination has occurred is made "with regard to all the facts and circumstances in a particular case."  26 C.F.R. § 1.411(d)-2(b)(1).  Such facts and circumstances may include:  "the exclusion, by reason of a plan amendment or severance by the employer, of a group of employees who have previously been covered by the plan; and plan amendments which adversely affect the rights of employees to vest in benefits under the plan."  *Id*.  In addition, a partial termination may be deemed to occur if, as a result of a cessation or decrease in future benefit accruals under the plan, "a potential reversion to the employer, or employers, maintaining the plan . . . is created or increased."  *Id*. at § 1.411(d)-2(b)(2).
    In general, the term "vertical partial termination" refers to a partial termination involving the exclusion of a group of participants from continuing coverage under a plan.  The determination of whether a vertical partial termination has occurred generally is based on a consideration of the entire period in question:  here, from March 1984 through June 1986.  Affected employees are those who ceased participation in the Gulf Plan, by termination of employment, during that period, other than those employees whose termination was not the result of the merger and those employees who were transferred to another company.  If either the number or the percentage of such excluded employees is "significant," a vertical partial termination has

7

determined, however, that the partial termination did not entitle plaintiffs to any part of the A&B Plan surplus assets. As to vesting of benefits, the district court noted regarding the vertical partial termination that Chevron agreed to vest in their then accrued A&B Plan benefits all participants terminated from Gulf employment during that March 1984 to July 1986 period, and regarding the horizontal partial termination the court decreed that all former Gulf employees employed by Chevron on July 1, 1986 were vested in their then accrued A&B Plan benefits. The issues concerning vesting of accrued benefits have been settled between the parties and are not at issue on this appeal, and as a part of the settlement plaintiffs do not defend the district court's finding that horizontal partial termination occurred. Plaintiffs do contend, however, that the district court, having correctly (according to plaintiffs) found a vertical partial termination, erred by holding that those former Gulf employees affected thereby were not entitled to their *pro rata* share of the A&B Plan's surplus assets.

---

occurred.
    The term "horizontal partial termination" refers to a partial termination involving a decrease or cessation in future benefit accruals. The decision of whether a horizontal partial termination has occurred is generally made by determining whether a cessation or decrease in future benefit accruals has occurred, and, if so, whether and to what extent a potential reversion to the employer maintaining the plan is thereby created or increased.
    In the present case, the district court based its conclusion that a vertical partial termination had occurred on its finding that both the number of employer-initiated terminations of non-vested participants (6,427, by one method of calculation) and the percentage by which those terminations reduced the number of non-vested participants (45.2 percent) were significant. *In re Gulf Pension Litigation*, 764 F.Supp. at 1170.

Chevron had urged us to vacate the district court's ruling that the A&B Plan had partially terminated as unnecessary to the portions of its judgment still in issue because neither ERISA nor the language of the Gulf Plan required distribution of surplus assets to the plaintiffs in the event of either a partial or full termination of the Plan.[10]  As discussed below, we conclude that the

---

[10]  Chevron's concern with this portion of the district court's ruling was the potential tax effect should the Internal Revenue Service (IRS) retroactively disqualify the Chevron Plan as a result of the thus found partial termination.

Following the merger of the Gulf and Chevron Plans, Chevron submitted an Application for Determination for Defined Benefit Plan to the IRS, seeking a determination as to whether a partial termination of the Gulf Plan had occurred during the interim period between March 1984 and June 30, 1986.  On December 7, 1987, the IRS issued an opinion letter finding that no partial termination had occurred and, therefore, that the Gulf Plan was not subject to the full vesting requirements of 26 U.S.C. § 411(d)(3).  The district court concluded that it owed no deference to the IRS determination, *In re Gulf Pension Litigation*, 764 F.Supp. at 1172, and subsequently ruled that the Gulf Plan had suffered both vertical and horizontal partial terminations.

In light of the district court's decision, the IRS subsequently reconsidered its earlier letter in favor of Chevron. In connection with its subsequent review of the matter, the IRS considered:  whether a partial termination had occurred; whether the Chevron Plan should be retroactively disqualified; and, if so, whether Chevron was entitled to relief under 26 U.S.C. § 7805(b), which permits the Secretary of the Treasury to prescribe the extent to which a ruling should be applied without retroactive effect.

In a Technical Advice Memorandum issued in 1992, the IRS concluded that a vertical partial termination of the Gulf Plan had occurred when, as a consequence of a single corporate event (the merger), both a significant number and a significant percentage of participants in the Plan were terminated without being vested in their accrued benefits.  The IRS found that no horizontal partial termination had occurred.  Finally, the IRS determined that, because Chevron had relied in good faith on its earlier ruling that no partial termination of the Gulf Plan had occurred, Chevron was entitled to section 7805(b) relief for the period beginning January 1, 1984, and continuing through December 31, 1991, at which time Chevron had fully vested all employees affected by the vertical partial termination.

plaintiffs were not entitled to surplus assets under the A&B Plan whether or not a partial termination, vertical or horizontal, occurred.[11]

II.  Entitlement to Surplus

Plaintiffs assert that they are entitled to a *pro rata* share of the surplus assets in the A&B portion of the Gulf Plan.  They argue that ERISA prohibits reversion of any plan assets unless the plan language contains an explicit reversion provision.  Plaintiffs rely upon ERISA section 403(c)(1), a part of section 403 which is entitled "Establishment of Trust."  Section 403(c)(1) directs that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."  29 U.S.C. § 1103(c)(1).  This provision, however, is subject to, *inter alia*, ERISA section 4044(d)(1), which specifically addresses allocation of surplus assets upon the *final* termination of a plan. Section 4044(d)(1) provides:

> "(1) Subject to paragraph (3) [addressing distributions of plans containing employee contributions], any residual assets of a single-employer plan may be distributed to the employer ifSQ
> > "(A) all liabilities of the plan to participants and

---

[11]    Because we do not consider whether or not a partial vertical (or horizontal) termination occurred, the district court's ruling on this issue is not conclusive between the parties. *Dow Chemical v. United States Envtl. Protection Agency*, 832 F.2d 319, 323 (5th Cir. 1987) ("`The federal decisions agree that once an appellate court has affirmed on one ground and passed over another, preclusion does not attach to the ground omitted from its decision.'") (quoting 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4421 (1981)); RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. o (1982).

their beneficiaries have been satisfied,
    "(B) the distribution does not contravene any provision of law, and
    "(C) *the plan provides for such a distribution in these circumstances*." 29 U.S.C. § 1344(d)(1) (emphasis added).[12]

In contrast, section 4044(d)(3)(A) provides that "[b]efore any distribution from a plan pursuant to paragraph (1) [above quoted], if any assets of the plan attributable to *employee* contributions remain after satisfaction of all labilities . . . such remaining assets shall be equitably *distributed to the participants who made such contributions* or their beneficiaries . . . ." (emphasis added).

Plaintiffs also seek support for their claim in the common law of trusts. Their premise for this argument is that, because pension benefits are a source of additional compensation for employees, the pension trust is not a gratuitous trust. *Ball v. Victor Adding Machine Co.*, 236 F.2d 170, 173 (5th Cir. 1956). Indeed, under common law, where surplus assets remained at termination of a trust established for consideration, a resulting trust of the surplus arose in favor of the person furnishing the consideration. RESTATEMENT (SECOND) OF TRUSTS § 434 (1959). However, although plaintiffs have rendered consideration to Gulf in the form of their services, this is not the situation envisioned by section 434. A trust established for consideration, in the context of that

---

[12]    Similarly, the Pension Benefit Guaranty Corporation regulations providing a formula for distribution of surplus assets at plan final termination to plan beneficiaries, 29 C.F.R. § 2618.32(a), apply only where the plan does not "provide[], as of the date of plan termination, for the return of residual assets to the employer" or where a provided for distribution "violate[s] any provision of law." 29 C.F.R. § 2618.30(a).

11

section, is one in which the owner of the property transfers it upon a trust to certain beneficiaries and receives consideration for the transfer *from a third party*, not from the beneficiaries themselves.

Further, while specified pension benefits in an employer funded defined benefit plan may be viewed as compensation for services rendered, an employer is not required by law to provide such benefits and if it undertakes to do so it is not required to do more than pay, or provide for payment of, those particular benefits. *See Malia v. General Electric Co.*, 23 F.3d 828, 832 (3d Cir. 1994) ("'A defined benefit plan gives current and former employees property interests in their pension benefits but not in the assets held by the trust.'"). An entirely employer funded defined benefit plan pension trust is therefore more akin to a gratuitous trust so far as concerns surplus assets, as to which ERISA so markedly distinguishes between those attributable to employee contributions and those attributable to employer contributions (thus suggesting that employer contributions are not a form of recontributed wages for such purpose). Where a gratuitous trust is fully performed without exhausting the trust estate, a resulting trust of the surplus is presumed to arise in favor of the settlor. RESTATEMENT (SECOND) OF TRUSTS § 430. This principle has been looked to in holding an employer entitled to surplus assets on termination of an employer funded defined benefit pension plan. *See Wilson v. Bluefield Supply Co.*, 819 F.2d 457, 464 (4th Cir. 1987) ("`Surplus' is the term used in the common law of trusts to describe any remaining assets in a trust after its

12

purpose has been fulfilled.  Under such circumstances, a `resulting trust' for the benefit of the creator of the original trust arises *by operation of law*, unless he manifested a contrary intent") (citing RESTATEMENT (SECOND) OF TRUSTS § 430); *Washington-Baltimore Newspaper Guild v. Washington Star Co.*, 555 F.Supp. 257, 260 (D.D.C. 1983), *aff'd mem.*, 729 F.2d 863 (D.C. Cir. 1984) ("the common law of trusts provides that an employer can retain such a surplus").

Plaintiffs claim that the language of the A&B Plan did not contain an explicit reversion provision as they assert is required by section 4044(d)(1), 29 U.S.C. § 1344(d)(1).  They rely on *Albedyll v. Wisconsin Procelain Co. Revised Retirement Plan*, 947 F.2d 246, 256 (7th Cir. 1991) ("unless the plan specifically provides for reversion to the employer, surplus assets go to beneficiaries and participants").  However, we note that section 4044(d)(1) merely requires that a plan "provide[]" for distribution of surplus assets to an employer, it does not say that the provision must be specific, explicit or express.  In any event, *Albedyll* is a total termination case,[13] and section 4044(d)(1) does not address a partial termination.[14]  Internal Revenue Code section 401(a)(2) allows employer reversion only on complete termination. 26 U.S.C. § 401(a)(2) (only after satisfaction of *all* liabilities).

---

[13]  As also is *Rinard v. Eastern Company*, 978 F.2d 265 (6th Cir. 1992), *cert. denied*, 113 S.Ct. 1843 (1993), which followed *Albedyll*, and which involved the total termination of the "Pension Plan for Hourly-Rated Employees of the Patin Manufacturing Company."  *See Id*. 978 F.2d at 266-267.

[14]  Nor do 29 C.F.R. §§ 2618.30(a) and 2618.32(a), *see* note 12 *supra*.

*See also* 26 C.F.R. § 1.401-2(b)(1). Internal Revenue Code section 411(d)(3) requires that a plan, in order to be qualified, provide that "upon its termination or partial termination . . . the rights of all affected employees to benefits accrued to the date of such termination, [or] partial termination . . . to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable." As previously noted, all participants in the A&B Plan who were terminated from Gulf during the March 1984-July 1986 period, and all former Gulf employees employed by Chevron on July 1, 1986, have been fully vested in their accrued A&B Plan benefits. Nothing in ERISA or the Internal Revenue Code mandates a distribution of any surplus assets on a partial termination or requires any particular provision in a plan in order to avoid such a result. *See, e.g., Chait v. Bernstein*, 835 F.2d 1017, 1021 (3d Cir. 1987) (in a partial termination § 411(d)(3) "should not be extended to apply to surplus assets . . . in a defined benefit plan"); *Van Orman v. American Insurance Co.*, 680 F.2d 301, 313 (3d Cir. 1982) (only rights to surplus are at complete termination under § 4044); *Walsh v. Great Atlantic & Pacific Tea Co. Inc.*, 96 F.R.D. 632, 652 (D. N.J. 1983) ("partial termination[] . . . would only result in those benefits defined in the 'Benefits' portion of the plan becoming non-forfeitable . . . . The persons affected by the partial termination would not become entitled then and there to a pro rata share of any excess assets. As long as the remainder of the plan remains ongoing, 'excess assets' is a meaningless concept, since the amount of any surplus can only be calculated after a complete termination of the plan"), *aff'd*, 726 F.2d 956 (3d Cir.

14

1983).  Nor can we construe "benefits accrued" under § 411(d)(3) to encompass a right, not specified in the plan itself, to a share of surplus assets in a defined benefit employer funded plan.  Treasury Regulation 1.411(a)-7(a) provides that in the case of a defined benefit plan "accrued benefit" for purposes of § 411 generally "refers only to pension or retirement benefits" and does "not include ancillary benefits not directly related to retirement benefits."  26 C.F.R. 1.411(a)-7(a).[15]  This conclusion likewise follows from *Malia*, where the Court held that "benefits" under § 1344 does not include a right to residual assets.  *Id*. 23 F.3d at 830-831.  And, *Malia* cited with approval the district court's opinion in the present case.  *Malia*, 23 F.2d at 832.  Further, in

---

[15]     Section 1.411-7(a) provides in part as follows:

>      "(a) *Accrued benefit*.  For purposes of section 411
> and the regulations thereunder, the term 'accrued
> benefit' meansSQ
>      (1) *Defined benefit plan*.  In the case of a
> defined benefit planSQ
>      (i) If the plan provides an accrued benefit in the
> form of an annual benefit commencing at normal
> retirement age, such accrued benefit, or
>      (ii) If the plan does not provide an accrued
> benefit in the form described in subdivision (i) of
> this subparagraph, an annual benefit commencing at
> normal retirement age which is the actuarial equivalent
> (determined under section 411(c)(3) and § 1.411(c)-(5)
> of the accrued benefit determined under the plan.  In
> general, the term 'accrued benefits' refers only to
> pension or retirement benefits.  Consequently, accrued
> benefits do not include ancillary benefits not directly
> related to retirement benefits such as payment of
> medical expenses (or insurance premiums for such
> expenses), disability benefits not in excess of the
> qualified disability benefit (see section 411(a)(9) and
> paragraph (c)(3) of this section), life insurance
> benefits payable as a lump sum, incidental death
> benefits, current life insurance protection, or medical
> benefits described in section 401(h)."

*Mead Corp. v. Tilley*, 109 S.Ct. 2156, 2162 (1989), the Court held that the comparable section 4044(a) "in no way indicates an intent to confer a right upon plan participants to recover unaccrued benefits" and that "all other benefits under the plan" as used in section 4044(a)(6) "can refer only to the allocation of benefits provided by the terms of the terminated plan." Finally, to construe "benefits accrued" in section 411(d)(3) as including a share in surplus assets would necessarily preclude an employer from ever reserving the right to receive any residual assets under § 4044(d)(1).

Consequently, we conclude that plaintiffs' rights to a *pro rata* share of residual or surplus assets on partial termination must rest on some provision of the plan itself, and not merely on section 4044(d)(1) or section 411(d)(3). We likewise conclude that unless the plan itself provided for such rights or precluded amendment providing for reversion of surplus to the employer on complete termination, then the partial termination did not of itself prevent such a reversionary amendment thereafter. *See Chait*, 835 F.2d at 1022 ("we find no authority that holds that a partial termination . . . precludes further plan amendments which do not interfere with the employees' anticipated and calculated rights under a defined benefit plan"). It is settled that a plan amendment may validly provide for reversion of surplus assets to the employer on final termination of an employer funded defined benefit pension plan. *See Outzen v. FDIC*, 948 F.2d 1184 (10 Cir. 1991); *Wilson*, 819 F.2d at 465; *Chait*. Accordingly, we turn now to the Plan language.

16

A.   Language of the A&B Plan

Plaintiffs base their argument on the language of section 10A-2 of the Plan, which governs the distribution of assets on termination of the Plan, *viz*:

> "Distribution of assets.  Upon termination of the Plan the rights of members to the benefits accrued under the Plan to the date of such termination, to the extent then funded, shall be nonforfeitable.  *All of the assets* held in trust, after provision for any properly chargeable expenses, *shall be used solely for* the members, pensioners, spouses, beneficiaries and joint pensioners *until all liabilities under the Plan shall have been satisfied in full*.  The Benefits Committee shall determine on the basis of an actuarial valuation the share of the funds of the Plan allocable to each member, pensioner, spouse, and joint pensioner in the following order:
>
> [there follows a six-tiered schedule of distribution directives]
>
> . . . .
>
> In the event of a partial termination of the Plan the provisions of this Section 10A-2 shall be applicable to the members affected by such partial termination.[16]
>
> In no event shall any part of the Plan assets held in trust or any income on it, *prior to the satisfaction of all liabilities under the Plan*, revert to the Company or be used other than for the members, pensioners, spouses, beneficiaries and joint pensioners."  (emphasis added)

The six-tiered schedule of distribution set forth in section 10A-2 as above indicated does *not* contain any direction for distribution or allocation of surplus assets.  Its allocations are *only* up to the amount of accrued benefits.

Section One of the 1944 Agreement of Trust of the A&B Plan echoes the language of section 10A.2:

---

[16]   This sentence was added to the Plan by a 1982 Plan amendment.

"The Corporation hereby establishes with the Trustee a trust, effective as of January 1, 1944, which shall comprise such payments as shall from time to time be made to the Trustee by or on behalf of the Corporation for the purposes of the Plan . . . . Any and all contributions made by the Corporation shall be *irrevocable* and no part of the corpus of the Fund nor any income therefrom shall at any time *prior to the satisfaction of all liabilities under the Plan* revert to the Corporation or be used for or diverted to purposes other than *for the exclusive benefit of* participants, retired participants or their beneficiaries under the Plan."  (emphasis added)

In particular, plaintiffs rely on the language providing that Gulf's contributions to the Plan were to be "irrevocable" and that the funds were to be used "solely for" or "for the exclusive benefit of" the plan participants. Defendants contend that these phrases, and the rights created thereby, are qualified by the phrases "until all liabilities under the Plan shall have been satisfied in full" and "prior to the satisfaction of all liabilities under the Plan."  This language, defendants argue, *implies* that reversion to the employer is contemplated once all liabilities are satisfied.[17]

*1.    Prior to the satisfaction of liabilities*

Although section 10A.2 does declare that Plan assets are not to revert to the employer, that language is qualified by the phrase "prior to the satisfaction of all liabilities under the Plan."

---

[17]    The A&B Plan contains no explicit statement *prohibiting* employer reversion of surplus assets.  In addition, as noted, the formula set forth in section 10A.2 of the A&B Plan for distribution of Plan assets does not contain any direction for the allocation of surplus assets to participants.

*In contrast*, the CRP, for example, contained no language impliedly reserving a right of reversion by Gulf, barred any amendment that would permit such a reversion, and allocated surplus assets to participants upon full termination of the plan. *In re Gulf Pension Litigation*, 764 F.Supp. at 1192.

Plaintiffs maintain that this phrase creates, at best, an implied reversion; they contend that ERISA section 4044(d)(1) requires an explicit reversion provision, citing *Albedyll*. However, as noted, section 4044(d)(1) does not apply to partial terminations, and *Albedyll* was a final, not a partial, termination case. Further, the *Albedyll* plan contained a section which the court interpreted "to provide for *pro rata* distribution of plan assets to the participants upon termination." In addition, an early outline of the plan "clearly indicated that the company could recover none of the contributed assets."

Other cases, dealing with plans having language more similar to that now before us, but without an express employer reversion provision, have allowed an employer to recapture surplus assets upon termination of the plan. *See Outzen v. Fed. Deposit Ins. Corp ex rel. State Examiner of Banks*, 948 F.2d 1184, 1186-87 (10th Cir. 1991) (where plan provided funds could not be used other than for the exclusive benefit of participant *prior to the satisfaction of all liabilities*, court held later amendment adding express reversion provision was valid).

Plaintiffs mount a second attack on the "prior to" phrase of section 10A.2, claiming that it is mere "boilerplate" language required by tax law. The phrase in question was part of section 165(2) of the Revenue Act of 1938, and became section 165(2) of the Internal Revenue Code of 1939. 53 Stat. § 165(2) (1939). It has been carried over into the present Internal Revenue Code.[18]

---

[18]  26 U.S.C. § 401(a)(2) establishes that a trust may be qualified

19

Plaintiffs contend that Gulf's use of the language in the A&B Plan was mere repetition of the 1938 statute.

In response, Chevron argues that the legislative history of section 165 supports reading the A&B Plan to allow employer reversion. The "prior to" phrase was added to the Revenue Act of 1938 to allow employers to recapture surplus assets without losing their exempt status under the tax laws.[19] S. REP. No. 1567, 75th Cong., 3d Sess. 24 (1938), *reproduced in* 1939-1 C.B. 779, 796. Thus, the "prior to" language of section 165 of the 1938 Revenue

------

"if under the trust instrument it is impossible, *at any time prior to the satisfaction of all liabilities* with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be . . . used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries . . . ."

[19] The 1942 Treasury Regulations discussing section 165 of the 1938 Revenue Act explain:

"*The* intent and *purpose in section 165(a)(2) of the phrase `prior to* the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust' is *to permit the employer to reserve the right to recover at the termination of the trust, and only at such termination, such balance in the trust as is due to erroneous actuarial computations during the previous life of the trust*. A balance due to an `erroneous actuarial computation' is the surplus arising because actual requirements differ from the expected requirements based upon previous actuarial valuations of liabilities or determinations of costs of providing pension benefits under the plan in accordance with reasonable assumptions as to mortality, interest, etc., and correct procedures relating to the method of funding, all as made by a careful person skilled in calculating the amounts necessary to satisfy pecuniary obligations of such a nature." Treasury Regulation § 29.165-2(b) (1942); 26 C.F.R. § 29.165-2(b) (1944 Cumulative Supplement at 6368) (emphasis added).

This regulation continues in effect today, without presently relevant substantive change. 26 C.F.R. § 1.401-2(b)(1).

20

Act did not require a rote phrase, without meaning or implication. Instead, it offered employers the ability, if desired, to establish a qualified pension plan in which the employer, upon final termination, received the surplus assets.

Based on the foregoing, we hold that in the context of section 10A-2 of the Plan, with its distribution allocation provisions not reaching surplus assets, the phrases "until all liabilities under the Plan shall have been satisfied in full" and "prior to the satisfaction of all liabilities under the Plan" at least implied the right to reversion in Gulf. We consider now whether any other language in the Plan limited or prohibited that right.

### 2.   *Irrevocability provision*

Plaintiffs assert that the "prior to" language discussed above is inconsistent with the provision that Gulf's contributions to the A&B Plan be irrevocable. The Plan has contained the "irrevocable" language since its inception in 1944.[20] Chevron claims that the drafters of the Plan were merely parroting references in the tax law as it existed in 1944 when the Plan was created. While the 1939 Internal Revenue Code did not specifically use the term "irrevocable," it decreed that a trust forming part of a pension plan would not be taxable under the Code

---

[20]   Section 10 of the 1944 Plan provided:

"In order further to implement the Plan the Corporation has entered into an Agreement of Trust to the end that such funds, as may be irrevocably contributed from time to time for the payment of all or any part of the annuities under the Plan, shall be segregated from the Corporation's own assets and held in trust for the exclusive benefit of the participants[.]"

21

> "if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees under the trust, for any part of the corpus or income to be . . . used for, or diverted to, purposes other than for the exclusive benefit of his employees."  Internal Revenue Code, 53 Stat. § 165(2) (1939).

The essence of this Code provision is that an employer may not revoke, or use for his own purposes, any part of corpus or income of the pension trust.  Our reading of this provision, to require an employer's contributions to be "irrevocable," is supported by the immediately succeeding section of the 1939 Code, which governs "Revocable Trusts."[21]  Thus, Gulf's use of the term "irrevocable" in the A&B Plan is not extraordinary, as plaintiffs contend, but merely a rephrasing of the then-current tax code provision governing pension trusts.

Furthermore, we agree with Chevron that "revocation" and "reversion" are not synonymous terms.

> "A power to revest or revoke may in economic fact be the equivalent of a reversion.  But at least in the law of estates they are by no means synonymous.  For, generally speaking, the power to revest or to revoke an existing estate is discretionary with the donor; a reversion is the residue left in the grantor on determination of a particular estate." *Helvering v. Wood*, 60 S.Ct. 551, 553 (1940).

The full termination of the A&B Plan and the fulfillment of its purpose by payment of accrued benefits to participants do not constitute a *revocation* of the Plan or of any of Gulf's

---

[21]    This section, entitled "Revocable Trusts," provides:

> "Where at any time the power to revest in the grantor title to any part of the corpus of the trust is vested . . . in the grantor . . . then the income of such part of the trust shall be included in computing the net income of the grantor."  53 Stat. § 166 (1939).

22

contributions to the Plan.  When all liabilities are satisfied, the Plan may terminate, and surplus assets revert to Chevron, without causing a revocation of the Plan.

Because defendants, through the merger, have not caused a revocation of the A&B Plan, the "irrevocable" provision does not determine whether the Plan allowed employer reversion of surplus assets.

### 3. *Exclusive benefit clause*

Plaintiffs claim that the A&B Plan could not provide for employer reversion of surplus assets because Gulf's contributions to the plan were to be used for the "exclusive benefit" of the plan participants and their beneficiaries.  Their argument fails to recognize, however, that the "exclusive benefit" requirements of tax law and ERISA are counterbalanced by provisions allowing employer recapture of surplus assets.

Both tax law and ERISA require the funds of a pension plan be used "for the exclusive benefit of" the plan participants.  26 U.S.C. § 401(a)(2); 29 U.S.C. § 1103(c)(1) ("for the exclusive purposes of providing benefits . . . and defraying . . . expenses").  Plaintiffs ignore the fact that both ERISA and the Internal Revenue Code also contemplate employer reversion.  The ERISA "exclusive benefit" provision is expressly made subject to the exception that when the plan finally terminates, surplus assets may revert to the employer if three conditions are then met, including that the plan provide for such a distribution.  29 U.S.C. § 1344(d)(1).  The "exclusive benefit" provision of Section 165 of the 1939 Revenue Code, quoted above, the law in effect in 1944 when

23

the A&B Plan was established, provided that a plan would be tax exempt if under the trust instrument it is impossible, *at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust*, for any part of the corpus or income to be used for purposes other than for the exclusive benefit of the participants or their beneficiaries.[22] Internal Revenue Code, 53 Stat. § 165(2) (1939).  The Treasury Regulations originally promulgated for section 165(a), which continue in effect without presently relevant substantive change, make clear that, notwithstanding the "exclusive benefit" phrase, the "prior to" language of that section permits the employer to recover surplus assets upon termination of the plan if those assets

---

[22]    Treasury Regulations in force when the A&B Plan was adopted explain the "exclusive benefit" requirement of section 165 of the 1939 Code:

> "Under section 165(a)(2) a trust is not exempt unless under the trust instrument it is impossible . . . for any part of the trust corpus or income to be used for, or diverted to, purposes other than for the exclusive benefit of such employees or their beneficiaries.  As used in section 165(a)(2), the phrase `if under the trust instrument it is impossible' means that *the trust instrument must definitely and affirmatively make it impossible for the nonexempt diversion or use to occur, whether by operation or natural termination of the trust*, by power of revocation or amendment, by the happening of a contingency, by collateral arrangement, *or by any other means*.  It is not essential that the employer relinquish all power to modify or terminate the rights of certain employees covered by the trust, but *it must be impossible for the trust funds to be used or diverted for purposes other than for the exclusive benefit of his employees or their beneficiaries*."  Treasury Regulation § 29.165-2(a) (1942); 26 C.F.R. § 29.165-2(a) (1944 Cumulative Supplement at 6368) (emphasis added).

This regulation continues in effect today without presently relevant substantive change.  26 C.F.R. § 1.401-2(a)(1) & (2).

stem from actuarial error.  *See* notes 19 & 22, *supra.*

Because both the Tax Code and ERISA require exclusive benefit language *and* contemplate that an employer may recover surplus assets after all plan liabilities are satisfied, the mere existence of the exclusive benefit provision in the A&B Plan cannot prohibit reversion to an employer.

Courts construing pension plans containing this "exclusive benefit" language follow the rule that the phrase does not prohibit reversion of surplus assets to the employer upon termination of the plan.  *See, e.g., Chait v. Bernstein*, 835 F.2d 1017, 1023 (3rd Cir. 1987) ("Thus, the text of ERISA itself demonstrates that the `exclusive benefit' language of ERISA § 403 is not at odds with reversion of the surplus of a single employer plan under § 4044(d)(1)(C)"); *Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co.*, 555 F.Supp. 257, 261 (D.D.C. 1983) ("section 4044(d)(1) of [ERISA] provides that an employer may retain a plan's surplus without running afoul of the exclusive benefit rule"), *aff'd mem.*, 729 F.2d 863 (D.C. Cir. 1984); *In re C. D. Moyer Co. Trust Fund*, 441 F.Supp. 1128, 1132 (E.D. Pa. 1977), *aff'd without published opinion*, 582 F.2d 1273 (3d Cir. 1978).

The use of the "exclusive benefit" language in the A&B Plan does not preclude reversion of surplus assets to Gulf.

B.    Prohibition of Amendments Decreasing Employee Rights

Plaintiffs extend their argument that the A&B Plan did not allow reversion of surplus assets to the employer, claiming that the language of the Plan also prohibited amendments creating a

right of reversion in the employer.[23]

The amendment provision of the A&B Plan stated as follows:

"The Board of Directors reserves the right at any time and from time to time to modify or to amend, in whole or in part, any or all of the provisions of the Plan, provided that:

"(a) No modification or amendment may be made which will deprive any person of any benefit under the Plan which has accrued on or prior to the time of such modification or amendment, and

"(b) No such modification or amendment shall make it possible for any part of the Trust Fund to be used for, or diverted to, purposes *other than for the exclusive benefit* of participants and retired participants, or their beneficiaries under the Plan." (Emphasis added.)

Other courts have held that "exclusive benefit" language in a plan does not, by itself, prevent an employer from amending a plan to allow reversion of surplus assets. In *Chait*, although the plan contained a provision similar to that in the Gulf Plan, the Third Circuit determined that the language of the plan did not prohibit a reversionary amendment. *Chait*, 835 F.2d at 1022-26.[24] The court held that "a vested employee who has fully received his vested benefits cannot rely on the `exclusive benefit' language, standing

---

[23]    Plaintiffs further assert, in the alternative, that even if the terms of the Plan did allow a reversionary amendment, the amendment of the Gulf Plan at the time of the merger resulting in the Chevron Plan (with its express reversion provision) was ineffective because it occurred after the partial termination of the A&B Plan. We reject this contention for the reasons previously stated.

[24]    The plan involved in *Chait* stated:

"no [amendment to the plan by the employer] shall authorize or permit any part of the funds held under the Plan to be used for or diverted to, purposes other than for the exclusive benefit of the Employees." *Chait*, 835 F.2d at 1022 (footnote omitted).

26

alone, to prevent an amendment reverting surplus plan assets" to the employer. *Id*. at 1018. *See also Outzen v. Federal Deposit Ins. Corp.*, 948 F.2d at 1186, 1187 (allowing reversion amendment despite exclusive benefit language, stating "[t]he cases which allow reversion as well as those which preclude it all dictate that strong, express prohibitory language is necessary to block employer recapture of surplus pension funds in a defined benefit plan"); *Wilson v. Bluefield Supply Co.*, 819 F.2d at 461-465 (allowing reversion of surplus assets despite "exclusive benefit" language in plan); *Washington-Baltimore Newspaper Guild Local 35*, 555 F.Supp. at 260-262; *In re C. D. Moyer Co. Trust Fund*, 441 F.Supp. at 1131-32.

Thus, a defined benefit plan must generally contain language other than the "exclusive benefit" phrase in order to preclude an amendment providing for employer reversion. For example, in *Bryant v. Int'l Fruit Products Co., Inc.*, 793 F.2d 118, 123 (6th Cir.), *cert. denied*, 107 S.Ct. 576 (1986), the Sixth Circuit held that an amendment to a defined benefit plan purporting to allow employer reversion was ineffective in light of strong plan language expressly prohibiting such an amendment. The plan contained, in addition to the standard "exclusive benefit" phrase limiting amendment, the phrase "*[i]n no event and under no circumstances* shall any contributions to this Trust by the Employer, nor any of the Trust Estate or the income therefrom, revert to or be repaid to the Employer." *Bryant*, 793 F.2d at 120 (quoting agreement) (emphasis added). The court found this language to be a unique, "unequivocal" prohibition against employer recapture of any

27

contributions to the plan.  *Id*. at 123.  Language in the handbook distributed to plan participants supported the *Bryant* court's conclusion:

> "Funds paid into the trust *can never be refunded to the Company* and are for the exclusive benefit of the employees under the Trust. . . .  It is definitely provided that the funds paid into the Trust are for your exclusive benefit and can *never, under any circumstances*, revert to the Company." *Id*. (quoting handbook) (emphasis added).

We conclude that the language of the A&B Plan prohibiting amendments other than for the exclusive benefit of the participants does not, by itself, preclude an amendment expressly allowing reversion to the employer.  Furthermore, as discussed above, the language of the Plan impliedly allowed such a reversion.[25]

The policies underlying ERISA support our conclusion.

> "Employers will continue to fund their plans under ERISA guidelines, but will not be penalized for overfunding in `an abundance of caution' or as a result of a miscalculation on the part of an actuary.  Thus, employees will continue to be protected to the extent of their specific benefits, but will not receive any

_____

[25]    Plaintiffs also rely on the summary plan description of the A&B Plan, required by ERISA section 102(a), 29 U.S.C. § 1022(a), for support of their claim that the plan did not allow employer reversion and could not be amended to provide therefor.  Our court has ruled that the summary plan description controls if a pension plan is ambiguous. *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991) ("hold[ing] that the summary plan description is binding, and that if there is a conflict between the summary plan description and the terms of the [plan], the summary plan description shall govern").
We do not consider the language of the A&B Plan to be ambiguous, nor do we find any conflict between its terms and those of the summary plan descriptions.  Indeed, the summary descriptions of the A&B Plan, in the portions concerning changes to the plan, track the language of the Plan itself, providing that Gulf had the right to change the plan, but that it could not "make any change that would allow the assets of the Plan to be used for anything but the exclusive benefit of members or their beneficiaries . . . ."

windfalls due to the employer's mistake in predicting the amount necessary to keep the Plan on a sound financial basis." *In re C. D. Moyer Co. Trust Fund*, 441 F.Supp. at 1132-33.[26]

Plaintiffs have received their expected benefits. An award of surplus assets, in light of Plan provisions inferentially and now expressly allowing employer reversion, would result in a windfall to the plaintiffs and would encourage defendants to fund the Chevron Plan more cautiously, to the potential detriment of present and future participants and their beneficiaries.

## III. Alleged Chevron Misrepresentations Concerning Reserve for Gulf Plan

During the merger negotiations, Chevron's chairman stated in a letter to Gulf's chairman that, if Chevron decided to combine the pension plans upon merger of the companies, Chevron would set aside assets of the Gulf Plan to provide sufficient reserves for then-existing retiree pensions. Chevron repeated that statement orally and in writing in response to inquiries from persons concerned about the effects of the merger. In their complaint, plaintiffs alleged that Chevron failed to set aside the promised reserves and thus had breached its duty of loyalty under ERISA § 404(a).[27] 29 U.S.C. § 1104(a). The district court held that this claim was not actionable under ERISA because plaintiffs' claims did not arise out

---

[26] This language from *In re C. D. Moyer Co. Trust Fund* was also quoted with approval in *Washington-Baltimore Newspaper Guild Local 35*, 555 F.Supp. at 260.

[27] According to the district court's opinion, no specific reserves were established. Plaintiffs' own expert testified, however, that the merged Chevron Plan had surplus assets in excess of accrued benefits of more than $800 million which would not be depleted below the full funding limit for a considerable time. *In re Gulf Pension Litigation*, 764 F.Supp. at 1213.

of an ERISA plan.  In addition, the court ruled that plaintiffs stated no claim under common law.

The district court determined, and plaintiffs concede, that Chevron's promises were not contained in a written plan document as required by section 402(a)(1) of ERISA.  29 U.S.C. § 1102(a)(1). That Chevron's statements were made in writing is irrelevant as they do not profess to be plan amendments.  ERISA requires that a plan under its auspices "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan."  29 U.S.C. § 1102(b)(3).

Our court has held that an oral agreement cannot sustain a cause of action under ERISA.  *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1297 (5th Cir. 1989).  *See also Rodrigue v. Western and Southern Life Ins. Co.*, 948 F.2d 969, 971-72 (5th Cir. 1991) (holding plaintiff precluded from arguing that employer was estopped from denying coverage based on oral modifications to plan); *Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir. 1989) (ERISA precludes oral modifications to plan and as well as claims of promissory estoppel in suit seeking to enforce rights to pension benefits).  This reasoning extends to written modifications or promises which are not, and do not purport to be, formal amendments of a plan following the procedures required by section 1102(b)(3). *See Alday v. Container Corp. of America*, 906 F.2d 660, 665-666 (11th Cir. 1990) (holding that booklet summarizing benefits and pre-retirement letters were insufficiently formal writings and did not amend ERISA plan; interpreting 29 U.S.C. § 1102(b)(3) to prohibit modification of plan by informal written agreement), *cert.*

*denied*, 111 S.Ct. 675 (1991). Chevron's statements did not purport to be part of, or an amendment to, either company's pension plan, nor is there any evidence that either Chevron or Gulf attempted to amend either plan to include the promises. Chevron's statements, therefore, are not part of any ERISA plan.[28]

In any event, the district court determined, and plaintiffs do not here challenge, that plaintiffs did not establish that they relied to their detriment on Chevron's promises and, even if they had so relied, that they suffered any injury as a result of any such reliance. Indeed, it is undisputed that the current reserves of the Chevron Plan are more than sufficient, without any additional contributions, to cover the benefits of both existing and future Gulf retirees for a significant time to come.

The district court did not err in holding that plaintiffs' claims for misrepresentation and breach of ERISA's duty of loyalty were not actionable under ERISA or the common law.

IV.   Seventh Amendment Right to Jury

Finally, plaintiffs challenge the district court's order granting Chevron's motion to strike their jury demand. They argue that several of their claims, particularly the claim for distribution of surplus assets, seek a money judgment and thus are legal in nature so as to entitle them to a jury trial.

---

[28]   Moreover, Chevron's statements were not shown to be made in its fiduciary capacity, as to opposed to being statements of intended action in its corporate nonfiduciary capacity as plan sponsor or settlor. *See, e.g., Malia*, 23 F.3d at 833; *Johnson v. Georgia-Pacific Corp*, 19 F.3d 1184, 1188 (7th Cir. 1994); *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1470-71 (11th Cir. 1986).

"To determine whether a particular action will resolve legal rights, we examine both the nature of the issues involved and the remedy sought." *Chauffeurs, Teamsters, and Helpers, Local No. 391 v. Terry*, 110 S.Ct. 1339, 1345 (1990). This analysis consists of two inquiries: (1) a comparison of the present statutory action to 18th-century actions in the courts of England before the merger of the courts of law and equity; and (2) an examination of the relief sought to determine whether it is legal or equitable in nature. *Id.* Of the two, the latter inquiry bears more weight. *Id.*

Here, the first inquiry is relatively simple, as ERISA law is closely analogous to the law of trusts, an area within the exclusive jurisdiction of the courts of equity. *Firestone Tire and Rubber Co. v. Bruch*, 109 S.Ct. 948, 954 (1989) ("ERISA abounds with the language and terminology of trust law. ERISA's legislative history confirms that the Act's fiduciary responsibility provisions `codif[y] and make[] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts'") (internal citations omitted; brackets in original). We have held, as have the majority of the other circuits, that ERISA claims do not entitle a plaintiff to a jury trial. *Calamia v. Spivey*, 632 F.2d 1235, 1237 (5th Cir. 1980) (inquiry into whether plan administrators acted arbitrarily and capriciously is action usually performed by judges). *See also Kirk v. Provident Life and Accident Ins. Co.*, 942 F.2d 504, 506 (8th Cir. 1991) (summarily rejecting jury trial argument); *Blake v. Unionmutual Stock Life Ins. Co.*, 906 F.2d 1525, 1526 (11th Cir. 1990) (claim for money damages was in effect claim for benefits plaintiffs were allegedly entitled to

32

under the plan, which is "traditionally equitable relief").

The second inquiry, although not as clear cut, also persuades us that plaintiffs' claims sound in equity. Some relief sought by plaintiffs is clearly equitable: they sought specific performance as a remedy to cure the alleged breaches of the duty of loyalty stemming from Chevron's promises to set aside reserves for Gulf Plan participants.

Plaintiffs' requests for monetary recovery on other claims, traditionally the form of relief offered in courts of law, do not mandate a conclusion that their action is legal in nature. *Calamia*, 632 F.2d at 1236-1237 ("The mere fact that the appellant would receive a monetary award if he prevailed does not compel the conclusion that he is entitled to a jury trial"). The Supreme Court has recognized two exceptions to the general rule that a claim seeking monetary recovery is legal in nature. In *Terry*, the Court made clear that a request for monetary recovery sounds in equity, and thus does not guarantee a jury trial, when it is restitutionary in nature or is intertwined with claims for injunctive relief. *Terry*, 110 S.Ct. at 1348. The first exception is particularly relevant in this case. Plaintiffs' request for distribution of surplus assets is analogous to an action for disgorgement of improper profits. In this claim, as well as in the now settled claims for breach of fiduciary duty, plaintiffs seek restitution of money allegedly wrongly held by the defendants.

We hold that plaintiffs' claim is equitable in nature. The district court did not err in striking plaintiffs' demand for a

33

jury.[29]

## Conclusion

We conclude that under the circumstances here the partial termination found by the district court of the A&B Plan, an entirely employer funded defined benefit pension plan, neither bestowed on plaintiffs any right to plan assets which were then surplus (after providing for all accrued benefits as required by § 411(d)(3)) nor precluded subsequent plan amendment to expressly provide that at final plan termination then surplus plan assets would revert to the employer.  We further hold that the A&B Plan prior to the 1986 merger at least implied that at final plan termination surplus assets would revert to the employer, and that the plan amendment on merger expressly providing for such reversion was authorized by, and not contrary to, the terms of the plan and was consistent with law.  Accordingly, we AFFIRM the district court's determination that the plaintiffs are not entitled to surplus assets of the A&B Plan.  In addition, we AFFIRM the district court's rulings that plaintiffs' misrepresentation claims against Chevron were not actionable and that plaintiffs were not entitled to a jury trial.  Accordingly, the judgment of the district court is

AFFIRMED.

---

[29]  Our conclusion is supported by the posture the case is now in, following the settlement of most issues.  Further, no issues of fact remain to be decided by a jury.