Opinion issued January 19, 2011.

 



 

 

 

 

In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00113-CV

———————————

Tyco Valves & Controls, L.P., and TV&C GP Holdings, Inc., Appellants

V.

Arsenio
Colorado, Steven Craig, Umit Davulcu, Richard Gonzales, Lanny Heinrich, Leonard
Hill, Andy Huynh, Chris Kahrig, Lay Keonakhone, Greg Lambousy, Tung Le, Chris
Luckey, Fernando Macias, Jorge Martinez, Raul Martinez, Kenneth Nash, Jimmy
Phoumlavanh, and Souk Vongsamphanh, Appellees



 



 

On Appeal from the 125th District Court 

Harris County, Texas



Trial Court Case No. 0819895

 



 

OPINION

          Appellees
(collectively, “the Gimpel employees”), sued appellants, Tyco Valves &
Controls, L.P. and TV&C GP Holdings, Inc.[1] (collectively, “Tyco”) for
breach of contract.  Following a bench
trial, the trial court entered judgment in favor of the Gimpel employees.  In nine issues, Tyco appeals, arguing that:
(1) the trial court erred by finding that the Gimpel employees’ claims were not
preempted by the Employee Retirement Income Security Act (“ERISA”);
(2) the trial court’s finding that the Gimpel employees’ contracts were
not related to Tyco’s ERISA Severance Plan was not supported by legally and
factually sufficient evidence; (3) the Gimpel employees’ claims are
related to ERISA because they sought and were awarded severance pay damages in
amounts identical to the severance pay that they would have been due under Tyco’s
ERISA Severance Plan, as stipulated by the Gimpel employees; (4) the Gimpel
employees’ claims are related to ERISA because the severance pay amounts the
Gimpel employees stipulated they were owed can only be accurately calculated
under Tyco’s ERISA Severance Plan.; (5) the Retention Incentive
Agreements’ use of the terms “the standard Severance” and “severance schedule
associated with the closure of this facility” are clear references to Tyco’s
ERISA Severance Plan; (6) the trial court’s conclusion that Tyco entered
binding and enforceable oral and/or written contracts to pay severance was
based on legally and factually insufficient evidence; (7) the trial court’s
findings concerning alleged oral contracts and an alleged bulletin board
posting are legally and factually insufficient; (8) the trial court’s finding
that the Retention Incentive Agreements are valid and enforceable contracts is
not supported by legally and factually sufficient evidence because there was no
evidence or insufficient evidence to establish a meeting of the minds regarding
the meaning of the term “standard Severance” in the Retention Incentive
Agreements; and (9) the evidence supporting the trial court’s conclusion that
Tyco breached its agreements with the Gimpel employees is legally and factually
insufficient.

We reverse and render judgment that
appellees take nothing by their claims.

Background

In 2006, appellees were all
employees of Tyco working in a unit that made specialized valves, known as
Gimpel valves.  The Gimpel Unit was located
in Tyco’s West Gulf Bank facility, which also housed several other Tyco
units.  The appellees performed a variety
of different functions within the Gimpel Unit.

In mid-2006, Tyco decided to close
the West Gulf Bank Facility and began to relocate or sell the various units
housed there.  Holly Kreindler, the Human
Resources Director of Tyco, created a document titled “Tyco Valves and Controls
Severance,” (hereinafter “West Gulf Bank Severance Schedule”) which provided:

Effective August 1, 2006,
Tyco Valves and Controls West Gulf Bank location will follow the following
Severance schedule.

Salaried employees will
receive 2 weeks of pay continuation for each full year of continuous service,
subject to a minimum of 6 weeks and a maximum of 26 weeks.

 

Hourly employees will
receive 1 week of pay continuation per full year of continuous service, subject
to a minimum of 6 weeks and a maximum of 26 weeks.

 

This policy shall apply to
bands 4 – 7 and supersede any prior plan, program or policy under which the
Company provided severance benefits prior to the Effective Date of the Policy.

 

This document listed conditions that must be met,
including executing and complying with a release provided by the company and authorizing
the deduction of amounts owed to the company prior to the payment of
severance.  It concluded with a list of
circumstances in which employees would not be eligible for severance benefits,
but it did not include any provisions relating to termination of employment due
to a sale or outsourcing of the unit or relating to calculation of an
employee’s years of service when the service was not continuous.

          In
December 2006, Tyco announced that it would attempt to sell the Gimpel
Unit.  In connection with this process,
the Gimpel employees entered into various Retention Incentive Agreements
(“RIAs”) that were signed by eleven of the Gimpel employees and either Sal
Vaccaro, the plant manager, or Paddy Warman, Tyco’s Human Resources
representative.  These agreements were
all dated between January 5, 2007 and January 15, 2007 and were made “by and
between Tyco Valves and Controls, its successors and assigns (‘Tyco’ or
‘Company’),” and the specific employee listed in each RIA.  The RIAs expressed Tyco’s desire to retain
the employees named in the RIAs because Tyco considered the “continuing
services, leadership and support by Employee during the Retention Period (as
defined below) to be very important to the ongoing effective management and
maintenance of the facility.”  

          The
RIAs provided that if the employee stayed through the retention period, Tyco
would pay:

(i) in the event that the
Employee is not offered Comparable Employment with Tyco, an amount equal to
[between $3,000 and $10,000] (Retention Bonus) plus the standard Severance in
accordance to the severance schedule associated with the closure of this
facility. . . .

 

                             OR

 

(ii) in the event that the
Employee is offered Comparable Employment with Tyco, a cash payment of [between
$3,000 and $10,000] subject to the Employee’s acceptable performance during the
Retention Period.

 

The RIA defined “Comparable Employment”:

For purposes of this
agreement, Comparable Employment shall mean that within 30 days after the end
of the Retention Period, the Employee is offered employment with [“Tyco”] of
comparable pay, status and skill level at a location that is within 25 miles of
Employee[’]s current work location.

 

Finally, the RIAs provided:

This Agreement sets forth
the entire understanding of Tyco and the employee, and supersedes all prior
agreements and communications, whether oral or written, pertaining to
eligibility for stay incentives of the type described herein . . . .  This Agreement shall not be modified except
by written agreement of the Employee and Tyco.

 

The RIAs did not state a specific dollar amount of
severance benefits or provide a severance schedule.

In April
2007, Dresser Rand Company (“Dresser Rand”) agreed to purchase the Gimpel
Unit.  As part of that transaction, Tyco
and Dresser Rand entered into an Asset Purchase Agreement.  In relevant part, that agreement states that the “Purchased Assets transferred . . . will exclude the
following assets[:] . . . all Seller Benefit Plans, the assets thereof and the
benefits available to participants thereunder . . . .”  

The Asset Purchase Agreement further states that
Dresser Rand shall not assume liability for

(i) any
wages, salary, severance, bonuses . . . (ii) any duties, obligations or
liabilities arising under any employee benefit plan, policy, or practice . . .
or (iii) any other amounts due to any employees or former employees of the
Business, in each case which accrue or arise prior to the Closing Date . . . . 

 

In the section of the Asset Purchase Agreement
concerning covenants and agreements on employees, the agreement states:

Purchaser shall at the Closing (or as soon as practicable thereafter)
offer employment to all or substantially all of Seller’s employees involved in
the operation of the Business and listed on Schedule 4.1(a) (the
“Prospective Employees”) at substantially the same base salary or hourly rate
as such Prospective Employees are employed by Seller immediately prior to
closing . . . .  All Prospective
Employees . . . who accept Purchaser’s offer of employment (the “Hired
Employees”) shall become employees of Purchaser as of the date specified in the
offer letter delivered to each such Hired Employee in accordance with Section
4.1 or such later date that such Hired Employee satisfies Purchaser’s
conditions of employment including, without limitation, background checks and drug
testing.  Seller shall terminate the
employment of each Prospective Employee with Seller immediately prior to the
date on which such person becomes a Hired Employee. Each Hired Employee shall
be eligible, from and after the first day of the month following the date on
which such Hired Employee becomes an employee of Purchaser, for the same
benefit plans of Purchaser as those offered to similarly situations employees
of Purchaser; provided, that each
Hired Employee, shall be eligible for coverage under Purchaser’s short-term
disability plan(s) from and after the date on which such Hired Employee becomes
an employee of Purchaser. Following the Closing Date, Purchaser shall ensure
that no exclusions or limitations with respect to any pre-existing conditions,
evidence of insurability or good health are applicable to any Hired Employees
or their dependents or beneficiaries under any health plan(s) in which such
Hired Employees may be eligible to participate.

 

Thus, the agreement between Tyco and Dresser Rand provides
that, after a prospective employee accepted an offer of employment with Dresser
Rand, Tyco would terminate that employee. 
The Asset Purchase Agreement states:

Notwithstanding
anything to the contrary contained in this Agreement, [Tyco] shall be solely
responsible for the payment of any and all compensation, retention, separation,
severance or similar payments due or to become due to any employee of [Tyco]
(including any Prospective Employee or any Hired Employee) pursuant to any
agreement, arrangement, commitment, applicable law, plan or course of dealing
between such employee and [Tyco], including without limitation any termination
payments or termination obligations arising in connection with this Agreement. 

 

Subsequent to the sale of the
Gimpel Unit to Dresser Rand, all of the Gimpel employees who are appellees in
this case were offered continued employment with Dresser Rand.  It is undisputed that the Gimpel employees stayed
with the Gimpel Unit through the end of the retention period and that Tyco paid
the retention bonuses as provided by the RIAs. 
The Gimpel employees were able to begin working for Dresser Rand
immediately following their termination from Tyco, and they worked in positions
largely identical to those they held with Tyco, with largely identical
seniority, benefits, and supervisors.  It
is also undisputed that Tyco did not pay any severance to the Gimpel employees.

On March 31, 2008, the Gimpel
employees filed suit against Tyco for breach of contract.  They alleged that “[t]he parties understood
that the standard severance would be paid if Tyco Valves sold [the Gimpel Unit]
to another company, and Plaintiffs entered into the contracts with that
understanding.”  The Gimpel employees
further alleged that they were not offered comparable employment with Tyco and
instead became employees of Dresser Rand, “which merely purchased assets from
Tyco Valves and is not a successor to Tyco Valves.”  Thus, the Gimpel employees asserted that Tyco
breached its contracts with them by failing to pay severance in accordance with
the RIAs or oral agreements.  Tyco denied
these claims, and it argued that it completely fulfilled its contractual
obligations because it required Dresser Rand to offer all Gimpel employees
comparable employment.

At trial, Lanny Heinrich, one of
the Gimpel employees who entered into an RIA, testified regarding his
understanding of the RIA agreement and the severance provision contained in
it.  He was told that his retention bonus
was smaller than that received by other employees because his lengthy
employment with Tyco meant that he would receive 26 weeks of severance when the
Gimpel Unit was sold.

The Gimpel employees introduced and
relied upon the West Gulf Bank Severance Schedule created by Holly Kreindler,
the Human Resources Director of Tyco, as the severance schedule referred to in
the RIAs and applicable to all employees at the West Gulf Bank Facility.  Kreindler testified at trial that she created
the West Gulf Bank Severance Schedule for her own personal use.  However, the document itself does not contain
any such disclaimer or other notation limiting or qualifying its
applicability.  Kreindler also testified
that the majority of the West Gulf Bank Severance Schedule was copied directly
from Tyco’s ERISA Severance Plan and that she created a slightly different
benefit schedule under the mistaken belief that she had the authority to do so.


Several Gimpel Unit employees,
including Christopher Kahrig and Lanny Heinrich, testified that they were aware
of and relied upon the severance terms provided in the West Gulf Bank Severance
Schedule.  Kahrig, in particular,
testified that he saw the West Gulf Bank Severance Schedule posted on the
bulletin board outside the cafeteria at the West Gulf Bank Facility around
January 2007.  The Gimpel employees also
produced several e-mails referring to the West Gulf Bank Severance Schedule as
the severance policy used during the closing of various facilities, including
the West Gulf Bank Facility, and discussed at “town hall meetings.”  The employees’ testimony relayed severance
terms consistent with the West Gulf Bank Severance Schedule created by
Kreindler.

Chris Luckey was the only Gimpel
employee claiming breach of an oral agreement to testify.  He stated that Warman, Tyco’s HR
representative, told him not to leave or he would not receive severance
pay.  Luckey did not testify regarding
the specific severance pay Warman was referring to in making that statement,
nor did Luckey testify regarding what specific severance pay benefits he was
expecting to receive.

          Tyco
introduced into evidence its official company-wide severance plan (“Tyco’s
ERISA Severance Plan”).  This plan was
the plan in effect beginning December 1, 2006. 
The relevant provisions include:

·       
A specific provision that the plan “is intended to be a ‘welfare benefit
plan’ within the meaning of Section 3(1) of ERISA”;

 

·       
Section 2.08, providing that “‘Company’ shall mean Tyco International
Ltd. Unless otherwise clear from the context, Company shall generally indicate
participating Subsidiaries.”

 

·       
Section 2.10, defining an “Eligible Employee” as one “who is not covered
under any other severance plan or program sponsored by the Company or a
Subsidiary other than the Tyco International Employee Transition Benefits Plan
and the Tyco International Employment Incentive Payment Plan. . . .”;

 

·       
Section 2.14, defining “Involuntary Termination” as meaning “a
termination of the Participant initiated by the Company . . . for any reason
other than Cause, Permanent Disability or death, as provided under and subject
to the conditions of Article III [of the plan]”;

 

·       
Section 2.18, providing that “‘Plan’ means the Tyco International (US)
Inc. Severance Plan for U.S. Employees as set forth herein, and as the same may
from time to time be amended.”

 

·       
Section 2.19, providing that “‘Plan Administrator’ shall mean the
individual(s) appointed by the Committee to administer the terms of the Plan as
set forth herein and if no individual is appointed by the Committee to serve as
the Plan Administrator for the Plan, the Plan Administrator shall be the Senior
Vice President—Human Resources, Tyco International (or the equivalent). . . .”

 

·       
Section 2.22, providing that “‘Severance Benefit’ shall mean the salary
continuation amounts and other benefits that a Participant is eligible to
receive pursuant to Article IV of the Plan.” 
The Plan does not provide a definition of “Severance.”  The term “Severance Period” is defined as
“the period during which a Participant is receiving Severance Benefits under
this Plan.”

 

·       
Section 3.02, providing the conditions that an employee must satisfy to
be eligible to receive severance benefits as described in the plan.  Specifically, Section 3.01(b)(ix) provides
that “An Eligible Employee will not be eligible to receive severance benefits”
when “[t]he Eligible Employee’s employment with the Employer terminates as a
result of a sale of stock or assets of the Employer, merger, consolidation,
joint venture or a sale or outsourcing of a business unit or function, or other
transaction, and the Eligible Employee accepts employment, or has the
opportunity to continue employment (without regard to whether the offer of
employment is for an Alternative Position), with the purchaser, joint venture,
or other acquiring or outsourcing entity, or a related entity of either the
Company or the acquiring entity.

 

·       
Section 3.02(c), providing that “[t]he Plan Administrator has the sole
discretion to determine an Eligible Employee’s eligibility to receive Severance
Benefits”; 

 

·       
Article Four, providing that the Severance Benefits include notice pay of
14 calendar days in addition to other Severance Benefits, “Salary Continuation
. . . as set forth under the benefits schedule appended to the Plan,”
payment of the employee’s pro-rated annual bonus, and continued eligibility to
participate in medical, dental and Health Care Reimbursement Account coverage
during the Severance Period.  Article
Four also contains provisions for dealing with “Stock Options and Other
Long-Term Incentive Awards . . . in accordance with the terms of the
applicable plan and/or individual award agreements under which such awards were
issued.”  Finally, Article Four provides
that Severance Benefits under the Plan are not owed if the employee voluntarily
resigns, dies, becomes permanently disabled, or is terminated for cause.

 

·       
Section 5.02, regarding “Other Arrangements,” stating, “[T]he Severance
Benefits under this Plan are not additive or cumulative to severance or
termination benefits that a Participant might also be entitled to receive under
the terms of a written employment agreement, a severance agreement or any other
arrangement with the Employer. . . .  The
provisions of this Plan may provide for payments to the Eligible Employee under
certain circumstances or bonus plans under circumstances where such plans would
not provide for payment thereof.  It is
the specific intention of the Company that the provisions of this Plan shall
supersede any provisions to the contrary in such plans, to the extent permitted
by applicable law, and such plans shall be deemed to be have [sic] been amended
to correspond with this Plan without further action by the Company or the
Board.”; and

 

·       
The schedule for severance benefits appended to this plan, which provides
that “[p]articipants other than Band 3 employees”[2] will receive severance pay
consisting of “1 week [pay] for each full year of service, subject to a minimum
of 2 weeks and a maximum of 52 weeks,” and that “Band 3 employees” will receive
“2 weeks [pay] for each full year of service, subject to a minimum of 26 weeks
and a maximum of 52 weeks.”

 

Tyco also presented evidence that, on February 27, 2007,
Laurie Siegel, Tyco International’s Senior Vice President of Human Resources,
adopted a new schedule of benefits for the employees of the West Gulf Bank Facility,
retroactively effective as of December 1, 2006. 
The new severance benefits schedule provided that certain hourly
employees (“Band 4–7” employees) would receive one week of severance for each
year of service, with a minimum of six weeks and a maximum of twenty-six weeks,
while salaried employees would receive two weeks for each year, subject to the
same minimum and maximum standards as the hourly employees.  “Band 3 employees” would be eligible for two
weeks of severance pay for each full year of service subject to a minimum of
twenty-six weeks and a maximum of fifty-two weeks.

The parties also introduced a joint
exhibit that provided a stipulation as to various facts such as respective
dates of hire, dates of termination, last rates of pay, subsequent employment
with Tyco or Dresser Rand, “and—assuming
that they are entitled to a severance under the Tyco Valves & Controls,
L.P.’s severance plan—the
calculated amounts of severance under the plan.” 

The trial court granted judgment in
favor of the Gimpel employees against Tyco and awarded damages according to the
parties’ stipulation.  The trial court
made numerous findings of fact and conclusions of law, including that ERISA did
not preempt the Gimpel employees’ claims, that the RIAs and oral agreements
were valid and enforceable, and that Tyco breached those agreements by failing
to pay severance in accordance with the terms of the West Gulf Bank Severance Schedule.  Tyco filed this appeal challenging the trial court’s
judgment.

Standard of Review

          In an appeal of a judgment rendered after a bench trial, the
trial court’s findings of fact have the same weight as a jury’s verdict, and we
review the legal sufficiency of the evidence used to support them just as we
would review a jury’s findings.  Daniel
v. Falcon Interest Realty Corp., 190 S.W.3d 177, 184 (Tex. App.—Houston
[1st Dist.] 2005, no pet.) (citing Catalina v. Blasdel, 881 S.W.2d 295,
297 (Tex. 1994)).  In conducting a
legal-sufficiency review, we credit favorable evidence if a reasonable fact-finder
could and disregard contrary evidence unless a reasonable fact-finder could
not.  City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005); Brown v. Brown, 236 S.W.3d 343, 348
(Tex. App.—Houston [1st Dist.] 2007, no pet.). 
We consider the evidence in the light most favorable to the finding
under review and indulge every reasonable inference that would support it.  City of Keller, 168 S.W.3d at
822.  We sustain a no-evidence contention
only if: (1) the record reveals a complete absence of evidence of a vital fact;
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact; (3) the evidence offered to
prove a vital fact is no more than a mere scintilla; or (4) the evidence
conclusively establishes the opposite of the vital fact.  Id. at 810; Merrell Dow
Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).

          In reviewing a challenge to the
factual sufficiency of the evidence, we must consider and weigh all the
evidence and should set aside the judgment only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  Arias v. Brookstone, L.P., 265
S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)). The trial court acts as
fact-finder in a bench trial and is the sole judge of the credibility of
witnesses.  HTS Servs., Inc. v.
Hallwood Realty Partners, L.P., 190 S.W.3d 108, 111 (Tex. App.—Houston [1st
Dist.] 2005, no pet.).  We review a trial
court’s conclusions of law de novo, and we will uphold the conclusions if the
judgment can be sustained on any legal theory supported by the evidence.  BMC
Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002); In re Moers, 104 S.W.3d 609, 611 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

ERISA Preemption[3]

          Tyco’s
central argument, as articulated in its first through fourth issues, its fifth
issue, and its eighth issue, is that the trial court erred by finding that the
Gimpel employees’ claims were not preempted by ERISA, and, thus, it erred in
finding that Tyco was obligated to pay severance benefits to the Gimpel
employees.  In essence, it argues that
reference to the terms of Tyco’s ERISA Severance Plan is essential to determine
its obligation to the Gimpel employees under the RIAs or under any alleged oral
agreements, and, therefore, recourse to the ERISA Plan is necessary to
determine each employee’s damages.  Thus,
the Gimpel employees’ claims that Tyco breached the terms of the RIAs and oral
agreements by failing to pay them the severance benefits offered under those
agreements are preempted by ERISA and are claims for benefits under the terms
of an ERISA plan.  The Gimpel employees
argue that the RIAs and oral agreements on which they base their breach of
contract claims were not part of or related to Tyco’s ERISA Severance Plan.[4]  They claim—and the trial court found—that
they are entitled to damages under state law for Tyco’s breach of their
individual written RIAs and oral agreements. 
Accordingly, the first question is whether the Gimpel employees’ claims
for breach of their oral and written agreements to pay severance were preempted
by ERISA, as presented in Tyco’s first five issues and part of its eighth.

Congress
enacted ERISA as a comprehensive system to regulate employee benefit plans “‘to
promote the interests of employees and their beneficiaries in employee benefit
plans’ . . . and ‘to protect contractually defined benefits.’”  Firestone Tire & Rubber Co. v. Bruch,
489 U.S. 101, 113, 109 S. Ct. 948, 956 (1989) (quoting Shaw v. Delta Airlines, Inc., 463 U.S. 85, 90, 103 S. Ct. 2890,
2896 (1983) and Mass. Mut. Life Ins. Co.
v. Russell, 473 U.S. 134, 148, 105 S. Ct. 3085, 3093 (1985)); Ambulatory Infusion Therapy Specialist, Inc.
v. N. Am. Adm’rs, Inc., 262 S.W.3d 107, 112 (Tex. App.—Houston [1st Dist.]
2008, no pet.).  The act regulates both
pension plans and welfare plans that provide benefits for contingencies such as
illness, accident, disability, death, or unemployment.  Cathey v. Metro. Life Ins. Co., 805
S.W.2d 387, 388 (Tex. 1991); Ambulatory
Infusion, 262 S.W.3d at 112.  While it provides standards and rules
governing reporting, disclosure, and fiduciary responsibility for pension and
welfare plans, ERISA does not mandate any particular benefits.  Shaw, 463 U.S. at 91, 103 S. Ct. at
2896–97; Ambulatory Infusion, 262 S.W.3d at 112.  ERISA section 1002(1) provides:

The
terms “employee welfare benefit plan” and “welfare plan” mean any plan, fund,
or program which was heretofore or is hereafter established or maintained by an
employer or by an employee organization, or by both, to the extent that such a
plan, fund, or program was established or is maintained for the purpose of
providing for its participants or their beneficiaries, through the purchase of
insurance or otherwise, . . . benefits in the event
of . . . unemployment. . . .

 

29 U.S.C. § 1002(1) (2006).  

ERISA section 1132 provides that
“[a] civil action may be brought . . . by a participant or
beneficiary . . . to recover benefits due to him under the terms
of his plan, to enforce his rights under the terms of the plan, or to clarify
his rights to future benefits under the terms of the plan.”  Id.
§ 1132(a)(1)(B).  The statute further
provides for concurrent jurisdiction in federal and state courts over actions
brought under section 1132(a)(1)(B) of the Act. 
Id. § 1132(e).  Except for actions under this subsection, the
United States district courts have exclusive jurisdiction over civil ERISA
actions.  Id.  

ERISA also includes expansive
preemption provisions, which are intended to ensure that the regulation of employee
benefit plans be “exclusively a federal concern.”  Alessi v. Raybestos‑Manhattan, Inc.,
451 U.S. 504, 523, 101 S. Ct. 1895, 1906 (1981); Ambulatory Infusion, 262 S.W.3d at 113.  To this end, Congress has statutorily
provided that ERISA “shall supersede any and all State laws insofar as they may
now or hereafter relate to any
employee benefit plan.”  29 U.S.C. § 1144(a)
(2006) (emphasis added); Ambulatory
Infusion, 262 S.W.3d at 113.  ERISA
preemption applies not only to state laws but to all forms of state action
dealing with the subject matters covered by the statute.  29 U.S.C. § 1144(c)(1); Shaw, 463
U.S. at 98, 103 S. Ct. at 2900; Ambulatory
Infusion, 262 S.W.3d at 113. 
Accordingly, when a state court suit, alleged in terms of a state common-law
or statutory cause of action, “relates to” an employee welfare benefit plan,
ERISA may preempt the state law in favor of federal law.  Metro. Life Ins. Co. v. Taylor, 481
U.S. 58, 63–67, 107 S. Ct. 1542, 1546–48 (1987); Gorman v. Life Ins. Co. of
N. Am., 811 S.W.2d 542, 545 (Tex. 1991); Ambulatory Infusion, 262 S.W.3d at 113.  

Thus,
to determine whether a state law has the forbidden connection to ERISA, we look
to both the objectives of ERISA and the effect of the asserted state law on an
ERISA plan.  Egelhoff v. Egelhoff,
532 U.S. 141, 147, 121 S. Ct. 1322, 1327 (2001); Ambulatory Infusion, 262 S.W.3d at 113.  Because ERISA is deemed to be comprehensive
with regard to the remedies provided and excluded, any state law cause of
action that duplicates, supplements, or supplants the ERISA civil enforcement
remedy conflicts with the congressional intent to make the ERISA remedy
exclusive and is preempted.  Ambulatory Infusion, 262 S.W.3d at 113 (citing Aetna Health, Inc. v. Davila,
542 U.S. 200, 209, 124 S. Ct. 2488, 2495 (2004)).

          The ERISA preemption provision is to be
broadly construed.  See Davila, 542
U.S. at 216–17, 124 S. Ct. at 2500; Ambulatory
Infusion, 262 S.W.3d at 113.  In
accordance with this policy, the Supreme Court has held that “[a] law ‘relates
to’ an employee benefit plan, in the normal sense of the phrase, if it has a
connection with or reference to such a plan.” 
Shaw, 463 U.S. at 96–97, 103
S. Ct. at 2900.  However,
the Supreme Court has also cautioned that “[s]ome state actions may affect
employee benefit plans in too tenuous, remote, or peripheral a manner to
warrant a finding that the law ‘relates to’ the plan.”  Shaw, 463 U.S. at 100 n.21, 103 S. Ct.
at 2901 n.21; Ambulatory Infusion,
262 S.W.3d at 113.

In
Fort Halifax Packing Co. v. Coyne,
the Supreme Court limited its ruling in Shaw,
holding that the preemption provision of ERISA was intended only to afford
employers the advantages of a uniform set of administrative procedures governed
by a single set of regulations.  482 U.S.
1, 11, 107 S. Ct. 2211, 2217 (1987). 
Because this concern arises only with respect to benefits whose
provisions by nature require an ongoing administrative program to meet the
employer’s obligation, the Court held that Congress intended only to preempt
state laws relating to ERISA plans
rather than those simply relating to benefits.  Id.  It pointed out that some severance benefit
obligations, by their nature, necessitate an ongoing administrative scheme,
while others do not.  Id. at 18, 107 S. Ct. at 2221.  And it held that those that do not
necessitate an ongoing administrative scheme “simply do not involve a state law
that ‘relate[s] to’ an employee benefit ‘plan.’”  Id.  Accordingly, the Court held that the state
statute at issue, which required a one-time lump-sum severance payment to
employees in event of their plant’s closing, did not require an administrative
scheme that created the potential for the type of conflicting regulation of
benefit plans that ERISA preemption was intended to prevent, and, therefore,
the state statute was not preempted by ERISA.

Following Fort Halifax, the Fifth Circuit held, in
Tinoco v. Marine Chartering Co., that
ERISA did not govern a dispute between an employer and officers of a company
acquired by the employer who had been given the right to participate in the
employer’s early-retiree health care plan as a severance benefit where the
employer had offered the officers the choice of a lump-sum payment or a stream
of payments until age 62, and, regardless of the option the officers chose, the
total amount to be paid was based on a one-time calculation using a fixed
formula that required no ongoing administrative scheme or discretionary
decisions by the plan administrator.  311
F.3d 617, 622–23 (5th Cir. 2002). 
Similarly, the Fifth Circuit has held that “a one-time lump sum payment,
contingent upon an event that may never materialize, ‘create[s] no need for an
on-going administrative program to process claims and pay benefits’ and
therefore is not a plan” subject to ERISA. 
Peace v. Am. Gen. Life Ins. Co.,
462 F.3d 437, 441 (5th Cir. 2006) (holding that claim alleging breach of
contract to provide annuity purchased with single premium payment was akin to
one-time severance benefit and did not constitute employee benefit plan under
ERISA); see also Fontenot v. NL Indus.,
Inc., 953 F.2d 960, 961, 963 (5th Cir. 1992) (holding that, because
severance plan involved only one-time lump sum payment triggered by single
event and required no administrative scheme, ERISA did not preempt claims
arising from senior executive severance plan which provided that if executive
were terminated within two years of change in control, company would pay
executive lump sum cash payment of three times his highest annual salary for
preceding three years plus three-year continuation of certain benefits); Wells v. Gen. Motors Corp., 881 F.2d
166, 168, 176 (5th Cir. 1989) (holding that ERISA did not preempt claims
arising from separation agreement negotiated after announcement of layoffs
which provided that employees could opt for severance payment in lieu of
preserving seniority and rehire rights, because plan was not ongoing, even
though employees could elect two-year installment payment option, and there was
no need for continuing administration of payment program).

In
addition, several federal courts outside the Fifth Circuit have addressed
instances in which employers allegedly made promises to employees to pay
severance benefits outside of existing ERISA-covered severance plans.  In Eide
v. Grey Fox Technical Services Corp., the plaintiffs alleged that Ceridan,
their employer, had made an oral promise to pay them a lump sum severance
benefit in the event that their unit was sold to another company and the buyer
terminated the employees within one year of the unit’s sale.  329 F.3d 600, 603 (8th Cir. 2003).  The Eighth Circuit concluded that,
“[a]lthough the benefits to be paid to Employees were calculated according to
the formulas provided by [Ceridan’s ERISA-covered plan], they were not to be
delivered pursuant to that plan,” and it concluded that “no ongoing
administrative scheme” was required for Ceridan to meet its obligations; thus,
Ceridan’s promise of severance pay did not “relate to” an ERISA plan.  Id. at
606.  

The holding
in Eide was similar to the Eighth Circuit’s
previous holding in Crews v. General
American Life Insurance Co., 274
F.3d 505 (8th Cir. 2001).  There, the
court held that the employer’s contractual obligation to pay severance was
independent of its ERISA plan; therefore, the breach of contract claim was not
preempted by ERISA.  Id. at 505–07.  In reaching
this conclusion, the court noted that the independent agreement provided a
higher amount of benefits to the employees and did not provide any discretion
to the employer.  Id. at 505.

The Fourth Circuit has also
considered whether an employer’s offer of severance benefits separate from
those offered by the employer’s ERISA-governed severance plan was covered by
ERISA.  Gresham v. Lumbermen’s Mut. Cas. Co., 404 F.3d 253, 259 (4th Cir.
2005).  It held that the separate
severance benefit agreement with the plaintiff operated independently from the
ERISA-governed severance plan.  Id.  It
noted that there were “substantial differences” between the plaintiff’s
severance benefits in his employment agreement and the terms of the
ERISA-governed severance plan—specifically,
the greater amount of benefits promised under the separate agreement—and that the severance award under the separate
agreement would not be paid out of funds allocated to the ERISA-governed
severance plan.  Id.  The court also noted
that it was unclear whether the separate agreement incorporated the
ERISA-governed severance plan by reference, but that “nothing in the remainder
of the employment agreement indicates that the Severance Plan even
exists.”  Id. at 261.

The same policy has been followed
in the only previous Texas state court case that has directly confronted this
issue.  Greathouse v. Glidden Co., 40 S.W.3d 560, 566–67 (Tex. App.—Houston
[14th Dist.] 2001, no pet.).  In that case,
the court of appeals held that ERISA preempted claims based on a plan providing
for the payment of severance benefits because the plan required the
determination of eligibility for benefits over an indefinite period of time,
which necessarily required an ongoing administrative scheme.  Id.

Thus, in order to determine whether
ERISA preempts the Gimpel employees’ claims, we must determine whether they are
attempting to enforce their right to receive benefits under the terms of Tyco’s
ERISA Severance Plan, to be administered in accordance with the ongoing
administrative scheme set out in that plan, or under separate agreements that
did not require ongoing administration under the scheme set out in Tyco’s ERISA
Severance Plan.

A.  
Meaning of
the Term “Standard Severance” in the Gimpel Employees’ Agreements

 

          The
Gimpel employees base their breach of contract claims on two different types of
agreements: twelve employees base their claims on written RIAs, and the
remaining six employees base their claims on alleged individual oral
agreements.  The Gimpel employees claim
that Tyco promised to pay severance under both types of agreements if the
employees continued working at the Gimpel Unit until it was closed or
sold.  The RIAs refer to “standard
Severance in accordance to the severance schedule associated with the closure
of this facility.”  The Gimpel employees
also assert that the only severance schedule of which they were aware, and the
schedule upon which their claims for breach of contract damages are based, was
the West Gulf Bank Severance Schedule. 
Thus, the employees argue that the severance payments promised in both
types of agreements were to be paid according to the West Gulf Bank Severance Schedule,
which, they contend, was an independent document not related to Tyco’s ERISA
Severance Plan.  

Tyco, however, contests the Gimpel
employees’ interpretation of the terms of their agreements, and it argues that
the trial court’s findings of fact and conclusions of law on this point are not
supported by legally and factually sufficient evidence.  It contends that it was obligated to pay
severance to the Gimpel employees as provided by its ERISA Severance Plan, that
the RIAs refer to this plan and must be interpreted in accordance with it, and
that the West Gulf BankSeverance Schedule was an unauthorized document that did
not modify the terms of its ERISA Severance Plan.

In its fifth and eighth issues,
Tyco argues that the Gimpel employees offered no evidence or insufficient
evidence that the term “standard Severance” in the RIAs referred to the West
Gulf Bank Severance Schedule; rather, Tyco argues that the RIAs’ use of
“standard Severance” is a reference to Tyco’s ERISA Severance Plan.  However, the Gimpel employees argue that the
reference to “standard Severance in accordance to the severance schedule
associated with the closure of this facility” referred to the West Gulf Bank
Severance Schedule.  They also argue that
the oral agreements were based on the West Gulf Bank Severance Schedule because it was the only plan Tyco provided to any
of the Gimpel employees.

We, therefore, must determine
whether the contracts with the Gimpel employees were ambiguous and, if so,
whether the trial court’s findings as to the meaning of the contested terms are
supported by sufficient evidence.

          The
issue of whether a contract is ambiguous is a question of law that we review de
novo.  DeClaris Assocs. v. McCoy Workplace Solutions, L.P., 331 S.W.3d
556, 562 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing Bowden v. Phillips Petroleum Co., 247
S.W.3d 690, 705 (Tex. 2008)).  If a
contract’s meaning is uncertain, or it is reasonably susceptible to more than
one interpretation, then it is ambiguous and its meaning must be resolved by
the finder of fact.  Id. (citing Lenape Res. Corp.
v. Tenn. Gas Pipeline Co., 925 S.W.2d 565, 574 (Tex. 1996)).  An ambiguity in a contract may be patent or
latent.  Id.  Patent ambiguity is
apparent on the face of the contract, while latent ambiguity only becomes
apparent when a facially unambiguous contract is applied under particular
circumstances.  Id. (citing Nat’l Union Fire
Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995)).

Here, we conclude that the RIAs contained
a latent ambiguity.  See id.  The ambiguous
meaning of “standard Severance” became apparent only once the parties attempted
to determine what severance, if any, was owed to the Gimpel employees.  See id.  The trial court, as finder of fact, resolved
this ambiguity by concluding that the term “standard Severance in accordance to
the severance schedule associated with the closure of this facility” referred
to the West Gulf Bank Severance Schedule.

A trial court’s findings of fact may be
overturned only if they are so against the great weight and preponderance of
the evidence as to be clearly wrong and unjust. 
Ortiz v. Jones, 917 S.W.2d
770, 772 (Tex. 1996) (per curiam) (citing Cain,
709 S.W.2d at 176).  Appellate courts
review the trial court’s conclusions of law de novo and will uphold the
conclusions if the judgment can be sustained on any legal theory supported by
the evidence.  See BMC Software, 83 S.W.3d at 794.

          The
trial court found that Kreindler created the West Gulf Bank Severance Schedule
in connection with a prior restructuring and communicated its terms to all of
the Gimpel employees through direct communications between HR personnel and the
employees, through communications by supervisory personnel, through bulletin
board postings, or through a combination of those means.  The trial court also found that HR personnel
made oral assurances to the employees that they would indeed receive
severances.  The trial court specifically
found that Kreindler’s testimony—that the West Gulf Bank Severance document was
not an actual severance schedule and instead was just her way of learning
Tyco’s ERISA Severance Plan—was not credible because of the e-mails admitted
into evidence.  The trial court also
found that Kreindler’s e-mails admitted that the terms of the West Gulf Bank
Severance Schedule had been communicated to all employees, either in writing or
orally, and was the policy used during a previous restructuring.  

          The
trial court concluded that the RIAs were valid and enforceable contracts, which
unambiguously provided that employees would receive severance to be calculated
by reference to the West Gulf Bank Severance Schedule.  The trial court also concluded that these
agreements were independent from Tyco’s ERISA Severance Plan.

          We
conclude that the findings of the trial court are supported by legally and
factually sufficient evidence.  The
wording of the West Gulf Bank Severance Schedule itself states that it is
“Effective August 1, 2006” and that “Tyco Valves and Controls West Gulf Bank
location will follow the following Severance schedule.”  Thus, by its own plain language, the West
Gulf Bank Severance Schedule purports to be the “severance schedule associated
with the closure of [the West Gulf Bank] facility.”  Furthermore, e-mails and testimony indicated
that Kreindler used the West Gulf Bank Severance Schedule during previous
restructuring, that all employees had been notified of that severance schedule
either orally or in writing, and that certain Tyco employees were aware Tyco
had promised severance to the Gimpel employees on those terms.  Heinrich and Kahrig testified that the terms
of the West Gulf Bank Severance Schedule were the only severance terms of which
they were aware, were the terms discussed with them when they entered into the
RIAs, and were the terms posted on bulletin boards and discussed at town hall
meetings.  This evidence supports the
trial court’s conclusion.  

Although Kreindler testified that
the West Gulf Bank Severance Schedule was not a separate severance schedule and
that she merely created it to help her learn about Tyco’s ERISA Severance Plan,
the trial court specifically found that her testimony on this matter lacked
credibility.  We defer to this
determination of the trial court.  See HTS Servs., Inc., 190 S.W.3d at 111.

          We
also observe that the
severance schedule adopted by Tyco International on February 27, 2007 as an
amendment to its ERISA-covered Severance Plan cannot, under the plain language
of the RIAs, be the “severance schedule associated with the closure of this
facility” because it was not adopted until after all of the Gimpel employees
signed their RIAs.  The RIAs included a
provision that they “shall not be modified except by written agreement of the
Employee and Tyco.”  Nothing in the
record indicates that the Gimpel employees agreed in writing to the amendment
of the severance schedule, and, in fact, the testimony of various employees at
trial indicated that they were not aware of any severance schedule except for
the West Gulf Bank Severance Schedule.

          Finally, we observe that the West Gulf
Bank Severance Schedule does not meet the requirements to be considered an
ERISA plan.  It is not an “employee welfare benefit plan” or
“welfare plan” as defined by ERISA section 1002(1).  That section defines those terms as “any
plan, fund, or program . . . established or maintained by an employer . . . for
the purpose of providing for its participants . . . benefits
in the event of . . . unemployment. . . .” 
29 U.S.C. § 1002(1); see also
Greathouse, 40 S.W.3d at 565 (“A plan under ERISA is established if, from
the surrounding circumstances, a reasonable person can ascertain the intended
benefits, a class of beneficiaries, the source of financing, and procedures for
receiving benefits.”) (citing Donovan v.
Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982)).  The West Gulf Bank Severance Schedule does
not contain complete information regarding the source of financing or
procedures for receiving benefits, it was not filed with the United States
Department of Labor, it did not apply to all of Tyco’s employees—just to the ones involved in the closure of the
West Gulf Bank Facility—and it was
not comprehensive.  See Greathouse, 40 S.W.3d at 565–66.  

Furthermore, this document is not
subject to ERISA because it does not create benefits requiring an ongoing
administrative program to meet the employer’s obligation.  See,
e.g., Tinoco, 311 F.3d at
622–23.  Nor can the West Gulf Bank Severance Schedule be
considered a modification of an ERISA plan. 
ERISA requires that a plan “provide a procedure for amending such a
plan, and for identifying the persons who have authority to amend the
plan.”  Greathouse, 40 S.W.3d at 567 (quoting Borst v. Chevron Corp., 36 F.3d 1308, 1323 (5th Cir. 1994)).  ERISA precludes all modifications which do
not purport to be formal amendments of a plan. 
Id.  The West Gulf Bank Severance Schedule does
not comply with the procedure of amending the plan set out in Tyco’s ERISA
Severance Plan, nor was it written and distributed by a person identified as
having the authority to amend the plan. 
The West Gulf Bank Severance Schedule does not purport to be a
modification of Tyco’s ERISA Severance Plan. 
See id.

          Thus,
we hold that the trial court did not err in concluding that the contracts
underlying this suit sought severance under the terms of the schedule set forth
in the West Gulf Bank Severance Schedule and that this schedule was not associated
with or related to an ERISA plan.

          We
overrule Tyco’s fifth issue and its eighth issue insofar as it refers to the
meaning of the term “standard severance.”

B.   Preemption of the Gimpel Employees’
Claims

          Having
determined the nature of the claims raised by the Gimpel employees, we now turn
to the question of whether the Gimpel employees’ breach-of-contract claims are
preempted by ERISA.  Specifically, we
address Tyco’s first issue, arguing that the trial court erred in finding that
the Gimpel employees’ claims were not preempted by ERISA; its second issue,
arguing that the trial court’s findings that the Gimpel employees’ contracts
were not related to Tyco’s ERISA Severance Plan were not supported by legally
and factually sufficient evidence; its third issue, arguing that the Gimpel
employees’ claims are related to ERISA because “the [Gimpel employees] sought
and the trial court awarded them severance pay damages in amounts identical to
the severance pay that they would have been due under Tyco’s ERISA-governed
severance plan, and [the Gimpel employees] stipulated that the amounts were
calculated in accordance with the terms of Tyco’s Severance Plan”; and its
fourth issue, arguing that the Gimpel employees’ claims are related to ERISA
because the severance pay amounts that the Gimpel employees stipulated they
were owed can only be calculated under Tyco’s Severance Plan.

The Gimpel
employees’ breach of contract claims are based on Tyco’s alleged breach of the
RIAs or on the alleged breach of oral agreements to pay severance in accordance
with the West Gulf Bank Severance Schedule. 
These agreements are not themselves an “employee welfare benefit plan”
or “welfare plan” as defined by ERISA section 1002(1).  See 29
U.S.C. § 1002(1) (defining those terms as “any plan, fund, or program . . .
established or maintained by an employer . . . for the purpose of providing for
its participants . . . benefits in the event of . . . unemployment . . .”); see also Greathouse, 40 S.W.3d at 565
(“A plan under ERISA is established if, from the surrounding circumstances, a
reasonable person can ascertain the intended benefits, a class of
beneficiaries, the source of financing, and procedures for receiving
benefits.”).  Rather, the RIAs state that
they were designed to provide an incentive for highly desirable employees to
remain at Tyco in order to keep the Gimpel Unit functioning and valuable.  The employees with oral agreements also
alleged that they were promised a severance payment for remaining employed with
the Gimpel Unit.  Thus, the Gimpel
employees claims for breach of these contracts do not “relate to” an employee
benefit plan “in the normal sense of the phrase.”  See
Shaw, 463 U.S. at 96–97, 103 S. Ct. at 2900.

In
looking both to the objectives of ERISA and to the effect of the asserted state
law on ERISA plans, we determine that our conclusion does not run afoul of
ERISA’s purposes.  See Egelhoff, 532
U.S. at 147, 121 S. Ct. at 1327.  This
case does not deal with a state law cause of action that duplicates, supplements,
or supplants the ERISA civil enforcement remedy in conflict with the congressional
intent to make the ERISA remedy exclusive and so is preempted.  See Davila, 542 U.S. at 209, 124 S.
Ct. at 2495.  Nor does it thwart such congressional
intentions as creating uniformity in employee benefit laws.  See
Fort Halifax, 482 U.S. at 11, 107 S. Ct. at 2217; see also Holland v. Burlington Indus. Inc., 772 F.2d 1140, 1147
(4th Cir. 1985) (recognizing Congress’s realization that national employers
depend on ERISA’s broad preemption provision to provide uniformity among
employees employed in numerous states).

Our
conclusion is also supported by the opinions of those federal courts that have
addressed instances in which employers allegedly made promises to employees to
pay severance benefits outside of existing ERISA-covered severance plans.  See
Gresham, 404 F.3d at 259; Eide,
329 F.3d at 605; Crews, 274 F.3d at
505.

Like the
agreement in Crews, Tyco’s
contractual obligation to pay retention bonuses and severance was independent
of its ERISA plan.  See 274 F.3d at 505.  Tyco’s
independent agreements with the Gimpel employees provided a higher amount of
benefits than Tyco’s ERISA Severance Plan to the employees to whom they were
offered; and they did not provide any discretion to the employer in awarding
those benefits if the conditions in the agreement were met, just as the Eighth
Circuit noted in Crews in determining
that the separate agreement at issue was not an ERISA plan.  See id.

Similarly,
the employer’s offer of separate severance benefits in Gresham operated independently from the ERISA-governed plan because
there were “substantial differences” between the plaintiff’s severance benefits
in his employment agreement and the terms of the ERISA-governed severance plan
(specifically, the greater amount of benefits promised under the separate
agreement) and because the severance award under the separate agreement would
not be paid out of funds allocated to the ERISA-governed severance plan.  See 404
F.3d at 259.  These were the factors the
Fourth Circuit examined to conclude that ERISA did not preempt the plaintiff’s
claims.  Id.  Here also, we have
already established that the terms of the RIAs are substantially different from
the severance provided by Tyco International’s ERISA-governed Severance
Plan.  See id.  Although it is not
clear from the record exactly what source was intended to pay the benefits owed
under the individual agreements with the Gimpel employees, it is clear that the
agreements did not “indicate[] that the [Tyco International ERISA-governed]
severance plan even exists.”  See id. at 261.

Thus, we conclude that the RIAs are
separate and independent from Tyco’s ERISA Severance Plan, do not “relate to”
that plan “in the ordinary sense of the word,” and are not preempted by ERISA.

Tyco argues, however, that the RIAs
“relate to” its ERISA Severance Plan through their reference to “standard
Severance.”  Tyco also argues that the calculation
of damages, as provided in the stipulation, requires that the parties refer to
Tyco’s ERISA Severance Plan because that is the only document containing
provisions for addressing issues such as calculating years of service where an
employee has a break in service.  We have
already held that the severance schedule referenced in the RIAs is a reference
to the West Gulf Bank Severance Schedule, which does not qualify as ERISA plan
and did not modify Tyco’s ERISA Severance Plan. 
Thus, we conclude that this reference is “too tenuous,
remote, or peripheral . . . to warrant a finding that the [agreement] ‘relates
to’ the plan.”  See Shaw, 463 U.S.
at 100 n.21, 103 S. Ct. at 2901 n.21); see
also Fort Halifax, 482 U.S.
at 7, 107 S. Ct. at 2215 (“ERISA’s pre-emption provision does not refer to
state laws relating to ‘employee benefits,’ but to state laws relating to
‘employee benefit plans.’”).

We hold that the
Gimpel employees’ state law claims for breach of the RIAs and oral agreements
are not preempted by ERISA.

We overrule Tyco’s
first, second, third, and fourth issues.

Having determined that the Gimpel
employees’ claims are not preempted by ERISA, we turn to the legal and factual
sufficiency of the trial court’s findings on the enforceability and breach of
the alleged agreements.

Contract Claims

In part of
its sixth, seventh, and eighth issues, Tyco argues that the trial court’s
findings that Tyco entered into binding and enforceable oral and written
contracts to pay severance are not supported by legally or factually sufficient
evidence.  In its ninth issue, Tyco
argues that the trial court’s conclusion that it breached its contracts with
the Gimpel employees is clear error and that it is supported by no evidence or
insufficient evidence.    

A.      Oral
Agreements[5]

          Six
employees base their breach of contract claims on alleged oral agreements, in
which they assert that Tyco promised to pay them severance if they remained
employed at the Gimpel Unit until it was closed or sold.  In part of its sixth and seventh issues, Tyco
challenges the trial court’s conclusion that it entered into valid and binding
oral agreements with some of the Gimpel employees.

          The
elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting
of the minds, (4) each party’s consent to the terms, and (5) execution and
delivery of the contract with the intent that it be mutual and binding.  Prime Prods., Inc. v. S.S.I. Plastics,
Inc., 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet.
denied).  The elements of written and
oral contracts are the same and must be present for a contract to be
binding.  Wal-Mart Stores, Inc. v.
Lopez, 93 S.W.3d 548, 555 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

For an agreement to be
enforceable, there must be a meeting of the minds with respect to its subject
matter and essential terms.  Id. at
556.  The determination of a meeting of
the minds, and thus offer and acceptance, is based on the objective standard of
what the parties said and did.  Id.  The execution of a contract includes the
performance of all acts necessary to render it complete as an instrument.  Verson Allsteel Press Co. v. Carrier Corp.,
718 S.W.2d 300, 303 (Tex. App.—Tyler 1985, writ ref=d n.r.e.) (per
curiam).

The
question of whether a contract contains all the essential terms for it to be
enforceable is a question of law.  Beal
Bank, S.S.B. v. Schleider, 124 S.W.3d 640, 653 n.8 (Tex. App.—Houston [14th
Dist.] 2003, pet. denied).  What terms
are material or essential to a contract are determined on a
contract-by-contract basis, depending on the subject matter of the contract at
issue.  See T.O. Stanley Boot Co. v.
Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992) (“Each contract
should be considered separately to determine its material terms.”).

          There is no evidence of any
valid oral agreements in this case.  The
only one of the six employees claiming breach of an oral agreement who
testified was Chris Luckey.  He testified
that Warman, Tyco’s HR representative, told him not to leave or he would not
receive severance pay.  Luckey did not
testify regarding the specific severance pay Warman was referring to in making
that statement, nor did he testify regarding what specific severance pay
benefits he was expecting to receive.  He
also testified that he did not rely on the expectation of severance pay in
making his decision whether to keep working for Tyco or to look for another
job.

          Luckey’s
testimony is insufficient to support the existence of any of the elements of a
contract between Luckey and Tyco.  See Prime Prods., Inc., 97 S.W.3d at 636
(holding that elements of valid contract include offer, acceptance, meeting of
minds, each party’s consent to terms, and execution and delivery of contract
with intent that it be mutual and binding); Lopez,
93 S.W.3d at 555 (holding that elements of contract are same for oral and
written contracts and must be present for contract to be binding).  It
does not support a finding that Tyco made an offer to Luckey or that he
accepted an offer, nor does it demonstrate a meeting of the minds as to the
subject matter of a contract between Tyco and Luckey or the essential elements
of the contract.  Regarding the remaining
five Gimpel employees who based their claims on oral agreements, there is no
evidence of any of the elements of a valid agreement between themselves and
Tyco.

          We
sustain Tyco’s sixth and seventh issues as they relate to the validity and
enforceability of the oral agreements. 
We hold that the trial court erred in awarding the employees with oral
contracts damages for breach of contract. 
See Prime
Prods., Inc., 97 S.W.3d at 636 (holding that party
must prove existence of valid contract to prevail on breach of contract
claim).  

B.      Written Agreements

In its eighth issue, Tyco argues
that the trial court erred in finding that the RIAs were valid and enforceable
contracts because there was no evidence or insufficient evidence of a meeting
of the minds.  In its ninth issue, it
argues that the evidence supporting the trial court’s conclusion that Tyco
breached its agreements with the Gimpel employees is legally and factually
insufficient.

We conclude that the evidence
supports the trial court’s finding that the executed RIAs were binding
contracts.  The record clearly reflects a
meeting of the minds between Tyco and the Gimpel employees who signed written
RIAs as to the subject matter and essential terms of the offer, acceptance, and
execution and delivery of the contract with the intent that it be mutual and
binding.  In each case, both parties
executed the agreement with the intent that it be binding.  Tyco promised Retention Bonuses—and “standard Severance in accordance to the
severance schedule associated with the closure of this facility” in the event
the employees were not offered “Comparable Employment with Tyco”—in return for key employees remaining employed
with the Gimpel Unit through the Retention Period.  The Gimpel employees accepted the terms of
the RIAs by signing the agreements and by continuing to work in the Gimpel
Unit.

To prevail on a breach
of contract claim, a plaintiff must prove: (1) the existence of a valid
contract; (2) the plaintiff’s performance or tender of performance; (3) the
defendant’s breach of contract; and (4) the plaintiff’s damages as a result of
the breach.  Prime Prods., Inc.,
97 S.W.3d at 636.  The interpretation or
construction of an unambiguous contract is a matter of law to be determined by
the court.  See Am. Mfrs. Mut. Ins.
Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003).

          The
RIAs provided that the employees would receive a specified Retention Bonus for
remaining employed with Tyco through the defined Retention Period.  It is undisputed that the Gimpel employees
remained with Tyco through the Retention Period and that Tyco paid them their Retention
Bonuses in accordance with the RIAs.  

The RIAs also provided that Tyco
would pay “standard Severance in accordance to the severance schedule
associated with the closure of this facility” if the employees were “not
offered Comparable Employment with Tyco.” 
“Comparable Employment” was defined to mean “that within 30 days after
the end of the Retention Period, the Employee is offered employment with the
Company of comparable pay, status and skill level at a location that is within
25 miles of Employee[’]s current work location.”  The RIAs also provided that the terms “Tyco”
or “Company” would mean “Tyco Valves and Controls, its successors and assigns.”

It is undisputed that the Gimpel
employees received offers of employment with Dresser Rand, the purchaser of the
Gimpel Unit, within thirty days of the end of the Retention Period that were
comparable in pay, status, and skill level and in a location within twenty-five
miles of their previous work location for Tyco. 
It is also undisputed that Tyco did not pay severance benefits to the
Gimpel employees.

          The
Gimpel employees argue that the RIAs provided that they were to receive
severance in the event they were not offered Comparable Employment with Tyco;
their subsequent employment by Dresser Rand does not qualify as Comparable
Employment with Tyco; and, thus, they were entitled to severance payments
consistent with the terms of the RIAs. 
Tyco, however, argues that it negotiated with Dresser Rand to ensure
that all of the Gimpel Unit employees received equivalent jobs satisfying the
definition of Comparable Employment in the RIAs.  It argues that the RIAs’ provision defining
“Tyco” and “Company” to include Tyco Valves and Controls and its “successors
and assigns” means that employment with the purchaser of the Gimpel Unit
satisfies the requirement for “Comparable Employment with Tyco.”  Thus, Tyco argues, it fulfilled its
contractual obligations under the RIAs.

The term “successor” in contract law is a term of art.  See Int’l
Ass’n of Machinists, Lodge No. 6 v. Falstaff Brewing Corp., 328 S.W.2d 778,
781 (Tex. Civ. App.—Houston 1959, no writ). 
A successor is “one who replaces or follows a predecessor” or “[a]
corporation that, through amalgamation, consolidation, or other assumption of
interests, is vested with the rights and duties of an earlier
corporation.”  Black’s Law Dictionary 1569 (9th ed. 2009).

When applied to corporations, the term 

“successor”
does not ordinarily connote an assignee, but is normally used in respect to
corporate entities, including corporations becoming invested with the rights
and assuming the burdens of another corporation by amalgamation, consolidation,
or duly authorized legal succession, and does not contemplate acquisition by
ordinary purchase from another corporation . . . .

 

Falstaff Brewing,
328 S.W.3d at 781; see Sitaram v. Aetna
U.S. Healthcare of N. Tex., Inc., 152 S.W.3d 817, 826 (Tex. App.—Texarkana
2004, no pet.); Farm & Home Savs.
Ass’n v. Strauss, 671 S.W.2d 682, 685 (Tex. App.—Dallas 1984, no
writ).  

The Texas statutory scheme concerning domestic business
organizations supports the interpretation of “successor and assigns” language
as extending responsibility or liability to an entity that expressly agrees to
assume a liability or obligation as part of an asset purchase.  Specifically, the Business Organizations Code
provides:

[A]
person acquiring property described by this section may not be held responsible
or liable for a liability or obligation of the transferring domestic entity that is not expressly assumed by the person.

 

Tex. Bus. Orgs. Code Ann. § 10.254(b) (Vernon 2011) (emphasis
added).  

Thus, the use of the
contractual language of “successors and assigns,” when connoting assumption of
future liability to perform a particular act—such as offering comparable
employment—extends to a business entity that makes an express agreement to
assume such an obligation as part of an asset purchase.  See id.;
Falstaff Brewing, 328 S.W.2d at 781; see also Regency Advantage Ltd. P’ship v.
Bingo Idea—Watauga, Inc., 936 S.W.2d 275, 278 (Tex. 1996) (per curiam)
(holding that subsequent purchaser not liable to pay commission on lease
because it did not expressly assume such liability); C.M. Asfahl Agency v. Tensor, Inc., 135 S.W.3d 768, 780 (Tex.
App.—Houston [1st Dist.] 2004, no pet.) (recognizing that in asset transfer,
successor acquires assets of corporation without incurring any of grantor
corporation’s liabilities unless successor expressly assumes those
liabilities). 

Accordingly, the “successors and assigns” language binds an
entity that merged with Tyco, a converting entity of Tyco, or an entity that agreed
to assume liability for the contractual obligations outlined in the RIAs.  See Tex. Bus. Orgs. Code Ann. §§ 10.008(a)(4) (Vernon 2011) (describing
effects of merger on liability or obligation allocated under plan of merger); 10.106(3)
(Vernon 2011) (providing that all liabilities and obligations of converting
entity continue to converted entity); 10.254(b) (providing that person is not
responsible for obligation or liability not expressly assumed by that person).  

Here, Dresser Rand is a “successor or
assign” of Tyco for purposes of the RIAs’ obligation to extend “Comparable
Employment” to the Gimpel employees if it expressly assumed Tyco’s obligation
to do so.  The evidence demonstrates that
each of the Gimpel employees was offered employment with Dresser Rand meeting
the definition of “Comparable Employment” in their RIAs.

The trial court, however, found
that employment with Dresser Rand was not equivalent to employment with Tyco
and that the RIAs did not allow Tyco to avoid paying severance on the basis of
job offers from Dresser Rand.  The trial
court also found that Dresser Rand was not a “successor or assign” of Tyco, did
not assume any of Tyco’s obligations to the Gimpel employees, and did not
acquire Tyco itself.  Rather, Dresser
Rand simply purchased certain assets from Tyco Valves—namely the Gimpel Unit.

          I conclude that the trial court
misconstrued the Asset Purchase Agreement and relevant terms of the RIA.  The plain language of the Asset Purchase
Agreement required Dresser Rand to offer employment to the Gimpel employees
under terms that met the definition of “Comparable Employment” in the RIAs, and
Dresser Rand was included in the definition of “Tyco” in the RIAs.  Thus, Dresser Rand was a successor of Tyco’s
obligation to offer the Gimpel employees Comparable Employment.  See Tex. Bus. Orgs. Code Ann. § 10.254(b); Falstaff Brewing, 328 S.W.2d at 781.  I further conclude that Tyco did fulfill the
terms of the RIAs because it contractually required Dresser Rand to assume
Tyco’s obligation to offer Comparable Employment to the Gimpel employees.

The Gimpel employees argue that
Dresser Rand could not be the successor of Tyco because the Asset Purchase
Agreement provided that Tyco would maintain its liability for payment of all
preexisting employment benefit agreements, including any retention bonuses or
severance due to Tyco’s former employees.[6]  However, this argument ignores the fact that
the Asset Purchase Agreement specifically obligated Dresser Rand to offer jobs
meeting the definition of “Comparable Employment” to the Gimpel employees and
that it did so.  Because the Gimpel
employees were offered “Comparable Employment” by Tyco’s successor, as provided
by the terms of the RIAs, the explicit terms of the RIAs did not require
payment of severance.  Therefore, the
provisions of the Asset Purchase Agreement addressing the allocation of liability
for any such payments are irrelevant.

I conclude that the evidence was
insufficient to support the trial court’s conclusion that Tyco breached the
RIAs.

          I
would sustain Tyco’s ninth issue.  I
would hold that the trial court erred by awarding the Gimpel employees with
RIAs damages for breach of contract.

Response to the Concurrence

The concurrence would hold that the
Gimpel employees’ contract claims are preempted by ERISA, and, therefore, they
may not be decided under state law, and also that the employees fail to state a
claim for benefits under ERISA section 1132(a), the only section of ERISA over
which the state courts have jurisdiction, and, therefore, they may not be
decided as claims for benefits under ERISA 
1132(a).  See 29 U.S.C. § 1132(a).  

The purpose of ERISA
preemption is to afford employers the advantages of a uniform set of
administrative procedures governed by a single set of regulations.  Fort
Halifax, 482 U.S. at 11, 107 S. Ct. at 2217.  Under the well-established body of federal
law that follows from Fort Halifax,
only those severance agreements that require administration under an employer’s
ERISA plan are preempted by ERISA.  See, e.g., Tinoco, 311 F.3d at 622; Peace, 462 F.3d at 441.  I am unaware of any authority for the position taken by the
concurrence that severance agreements made with employees outside of a
company’s ERISA severance plan cannot be decided under state law regardless of
whether they require ongoing administration under the company’s plan.  Nor can I find any authority for the position
that ERISA preempts state law claims for which it fails to provide a cause of
action under ERISA section 1132(a).  Nor
does the concurrence cite any law in support of this argument other than the
conclusory comment that the employees’ claims in this case “relate to” an ERISA
plan and are therefore both preempted and not cognizable under ERISA.




 

Conclusion

We reverse the trial court’s
judgment and render judgment that the Gimpel employees take nothing by their breach
of contract claims. 

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Sharp, and Massengale.

Justice
Sharp, dissenting in part.

Justice
Massengale, concurring in the judgment only.

 











[1]           TV&C GP Holdings, Inc. is the
general partner of Tyco Valves & Controls, L.P.

 





[2]
          The definitions for the various
“bands” of employees are not included in the record.  However, none of the parties’ arguments
depend upon which “band” the employees belonged to, and each Gimpel employee
entered into an agreed stipulation regarding the amount of severance he was
allegedly owed.





[3]
          Justice Sharp joins this portion
of Justice Keyes’s opinion, agrees that the Gimpel employees’ claims are not
preempted by ERISA, and analyzes their claims under state contract law
principles.

 





[4]
          Specifically, in its first issue, Tyco argues
that the trial court erred in finding that the Gimpel employees’ claims were
not preempted by ERISA.  In its second
issue, it argues that the trial court’s findings that the Gimpel employees’
contracts were not related to Tyco’s ERISA Severance Plan are not supported by
legally and factually sufficient evidence. 
In its third issue, it argues that the Gimpel Employees’ claims are
related to ERISA because “the [Gimpel employees] sought and the trial court
awarded them severance pay damages in amounts identical to the severance pay
that they would have been due under Tyco’s ERISA-governed severance plan, and
[the Gimpel employees] stipulated that the amounts were calculated in
accordance with the terms of Tyco’s Severance Plan.”  In its fourth issue, it argues that the
Gimpel employees’ claims are related to ERISA because the severance pay amounts
that the Gimpel employees stipulated they were owed can only be calculated
under Tyco’s ERISA Severance Plan.  In
its fifth issue, it argues, in support of its claims, that the RIAs’ use of the
terms “the standard Severance” and “severance schedule associated with the
closure of this facility” are clear references to Tyco’s ERISA Severance Plan.  And, in its eighth issue, it argues that the
trial court’s conclusions that the RIAs are valid and enforceable contracts is
not supported by legally and factually sufficient evidence because there was no
evidence or insufficient evidence to establish a meeting of the minds regarding
the meaning of the term “standard Severance” in the RIAs.

 





[5]
          Justice Sharp also joins the
portion of Justice Keyes’s opinion holding that the alleged oral agreements are
unenforceable and that the written RIAs are binding, enforceable contracts.





[6]
          The dissent finds this argument
persuasive and states that “[Dresser Rand] specifically did not take on Tyco’s burdens concerning
these employees.”  Slip op. at 4.  However, this statement ignores the plain
language of the Asset Purchase Agreement obligating Dresser Rand to offer Comparable
Employment to the Gimpel employees.